# 23-7976

IN THE

## United States Court of Appeals

FOR THE SECOND CIRCUIT

ASHLEY NEWBURY,

*Plaintiff - Appellant,*

- versus -

CITY OF NIAGARA FALLS,

*Defendant - Appellee.*

ON APPEAL FROM A JUDGMENT AND ORDER OF THE UNITED STATES
DISTRICT COURT FOR THE WESTERN DISTRICT OF NEW YORK

# APPELLANT'S BRIEF & SPECIAL APPENDIX

SANDERS & SANDERS
HARVEY P. SANDERS
*Attorney for Plaintiff-Appellant*
401 Maryvale Drive
Cheektowaga, NY 14225
Telephone: (716) 839-1489
Facsimile: (716) 839-1512
Email:
harvey.sanders@wnyemploymentlaw.com

Printed on recycled paper

# TABLE OF CONTENTS

Table of Contents   …………………………………………………………i

Table of Authorities ………………………………………………………ii

Jurisdictional Statement …………………………………………………1

Questions Presented for Review ...………………………………………2

Summary of the Argument  …………………………………………...2

Brief Relevant Factual and Procedural History ...………………………………3

Argument  ………………………………………………………………6

THE DISTRICT COURT'S DISIMSSAL OF THE CLAIMS MUST BE
REVERSED BECAUSE THE DISTRICT COURT IMPROPERLY
CONCLUDED THAT THERE WERE NO GENUINE DISPUTES AS TO ANY
MATERIAL FACTS AND THAT THE DEFENDANTS WERE ENTITLED TO
JUDGMENT AS A MATTER OF LAW ………..……………………………6

I.      SEX DISCRIMINATION …………………………………...8

   a. Hostile Work Environment …………………………………11

   b. Disparate Treatment …………………………………………...23

II.     RETALIATION………………………………………………...28

Conclusion        …………………………………………………35

Certificate of Compliance   …………………………………………36

Certificate of Service        …………………………………………37

i

# TABLE OF AUTHORITIES

## *Federal Cases*

*Bhatti v. Physician Affiliate Grp. of N.Y.*,
No. 21-2522, 2022 U.S. App. LEXIS 33909, at *3 (2d Cir. 2022) ………18, 29, 32

*Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998) ……………..9, 15

*Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) ……..8

*Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) …………7

*Chertkova v. Connecticut Gen. Life Ins.*, 92 F.3d 81, 87 (2d Cir. 1996) ………….6

*Crist v. Focus Homes, Inc.*, 122 F.3d 1107, 1111 (8th Cir. 1997) ………………15

*Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) ………………..9, 11

*Daniel v. T&M Prot. Res., LLC*, 689 F. App'x 1 (2d Cir. 2017) ………………6, 10

*Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) ……………………………8

*Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009) ……………………...12, 13, 15

*Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998) ………………….....9

*Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004) ………………………..10

*Gallagher v. Delaney*, 139 F.3d 338, 347 (2d Cir. 1998) ………………..11, 17, 23

*Gordon v. New York City Bd. of Educ.*,
232 F.3d 111, 116 (2d Cir. 2000) ...……………………………18, 30, 31, 32, 34

*Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010) …………7

*Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 174 (2009) ………………………..24

*Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) ……………………..7, 8, 9

ii

*Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) …………………………7

*Holtz v. Rockefeller & Co.*, 258 F.3d 62, 75 (2d Cir. 2001) …………………..10

*Johnson v. Advocate Health & Hosps. Corp.*,
  892 F.3d 887, 901 (7th Cir. 2018) …………………………………………..10

*Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 548 (2d Cir. 2010) …………6, 9, 10

*Lenzi v. Systemax, Inc.*, 944 F.3d 97, 108 (2d Cir. 2019) ………………………...24

*Lillico v. Roswell Park Comprehensive Cancer Ctr.*, No. 21-CV-836-LJV,
  2022 U.S. Dist. LEXIS 104215 (W.D.N.Y. Jun. 10, 2022) …………...8, 25, 26, 27

*MacCluskey v. Univ. of Conn. Health Ctr.*,
  No. 17-0807-cv (2d Cir. Dec. 19, 2017) ……………………………………..13, 22

*Massaro v. New York City Dep't of Educ.*,
  No. 21-266-cv, 2022 U.S. App. LEXIS 15143, *2 (2d Cir. June 2, 2022) ………29

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) …………………..24, 28

*Murray v. N.Y.U. Coll. of Dentistry*, 57 F.3d 243, 249 (2d Cir. 1995) …...12, 13, 22

*Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998) ……………8

*Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 150 (2d Cir. 1997) ……………………..9

*Porter v. Dartmouth-Hitchcock Medical Center*,
  No. 20-3894 (Feb. 6, 2024) …………….…………………………….........11, 17

*Raniola v. Bratton*, 243 F.3d 610, 617 (2d Cir. 2001) …………………………10

*Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012) ………………10, 11

*Schiano v. Quality Payroll Systems, Inc.*,
  445 F.3d 597, 605 (2d Cir. 2006) ……………...………………………10, 17, 29

*Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) …………………... 10

iii

*SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) …….6, 7

*Sotomayor v. City of New York*, 713 F.3d 163, 164 (2d Cir. 2013) ………………..6

*Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013) …………………14, 15

*Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013) …………………….........12

*Vasquez v. Empress Ambulance Serv., Inc.*,
835 F.3d 267, 273-74 (2d Cir. 2016) ………………………………………15, 16

*Velazquez-Perez v. Developers Diversified Realty Corp.*,
753 F.3d 265, 273-74 (1st Cir. 2014) …………………………………….…16

*Walsh v. New York City Hous. Auth.*, 828 F.3d 70, 74 (2d Cir. 2016) …………...24

*Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013) ……………29

*Federal Statutes, Rules, and Regulations*

42 U.S.C. § 2000e ……...…………………………..1, 4, 8, 10, 13, 14, 15, 16, 28

*State Statutes, Rules, and Regulations*

N.Y. Exec. L § 296  ……..…..………………………………....1, 4, 13, 28, 29

N.Y. Exec. L § 296-D  …………………………………………………..13, 14

iv

# JURISDICTIONAL STATEMENT

The District Court has original jurisdiction pursuant to 28 U.S.C. § 1331 and § 1343 (4), as this case asserts rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"). The District Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367, as Plaintiff-Appellant raises claims pursuant to the New York State Human Rights Law, N.Y. Exec. L § 296 et seq. ("NYSHRL"), which claims are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy as the federal claims raised herein.

This Court has jurisdiction pursuant to Rule 3(a) of the Federal Rules of Appellate Procedure, as the instant appeal is taken from a judgment and order of a District Court. Pursuant to Rule 4(a) of the Federal Rules of Appellate Procedure, the instant appeal is timely as it was filed on December 8, 2023, which filing date is within 30 days after entry of the judgment and order of the District Court appealed from, which was entered on November 13, 2023, and which judgment and order constituted a final order and judgment disposing of all parties' claims herein.

## QUESTIONS PRESENTED FOR REVIEW

Should the judgment and order of the District Court granting summary judgment in Defendant-Appellee's favor and dismissing Plaintiff-Appellant's claims for sex discrimination and retaliation be vacated on the grounds that it was erroneous?

This question should be answered in the affirmative.

## SUMMARY OF THE ARGUMENT

Plaintiff-Appellant (hereinafter referenced simply as "Plaintiff") submits this Brief in support of her Appeal seeking vacatur of the decision of the United States District Court for the Western District of New York (the "District Court") granting summary judgment in favor of Defendant-Appellee, (hereinafter referenced simply as "Defendant" or "NFPD"), which decision unreasonably dismissed each of Plaintiff's causes of action raised against Defendant.

The decision of the District Court must be vacated because it was readily apparent from the written submissions of all parties at summary judgment that myriad genuine issues of material fact persisted at that stage. In fact, the District Judge concluded that Plaintiff, who was the only female among her class of recruits at Defendant's police training academy, established that she indeed suffered a hostile work environment because of her sex after the evidence established she endured relentless verbal and physical attacks from her male peers

2

and supervisors. Nevertheless, the District Judge concluded that Defendant was not liable for allowing this hostile work environment to exist and fester. In doing so, the District Court drew several factual and legal conclusions in favor of Defendants' arguments for dismissal, even though the District Court lacked any support from either the record or legal authority to reach those conclusions. Additionally, the District Court excluded, disregarded, or otherwise discredited key evidence presented by Plaintiff in opposition to the Defendants' summary judgment motion – evidence demonstrating similar genuine issues of material fact that made summary judgment inappropriate. Simply, the District Court committed clear error when it reached determinations on the evidence that should have been reserved for a jury.

## BRIEF RELEVANT FACTUAL AND PROCEDURAL HISTORY

The instant action was brought before the United States District Court for the Western District of New York with the filing of Plaintiff's Verified Complaint on August 4, 2017 (the "original Complaint") which original Complaint named the Niagara Falls Police Department as the sole defendant. A 2-3. Plaintiff filed a motion before the District Court to amend her original Complaint in order to avoid any dispute concerning the identity of the defendant, and counsel for Defendant herein did not oppose Plaintiff's motion. Plaintiff filed her Amended Complaint on September 16, 2019. A 8-24.

Plaintiff's Amended Complaint raised Causes of Action for discrimination on the basis of sex in violation of Title VII and the NYSHRL, and retaliation for opposing unlawful discrimination on the basis of sex in violation of Title VII and the NYSHRL.  A 14-15.   Specifically, Plaintiff alleged Defendant engaged in a pattern and practice of discrimination against her on the basis of her sex (female), including disparate treatment and a hostile work environment, while she was an NFPD recruit in training at the Niagara County Law Enforcement Academy (the "Academy"), which is jointly run by the NFPD and the Niagara County Sheriff's Office ("NCSO").  A 9-15.  Plaintiff, who was the only female recruit in her class at the Academy, alleged a pattern of disparate treatment and verbal and physical abuse, including insults about her appearance and her "hormones," constant statements that she was a disgrace and that she should quit, being threatened with a knife, being physically thrown to the ground and suffering physical injury as a result, being socially ostracized and ridiculed by the male recruits, being held to higher standards for some tests and being inaccurately graded on others, and ultimately being dismissed from the Academy (and having her employment terminated).  A 9-15.  Plaintiff also alleged Defendant terminated her employment in retaliation against her complaints about the discrimination she suffered.  A 11.

Defendant filed a motion for summary judgment on April 14, 2023, seeking dismissal of Plaintiff's Verified Amended Complaint in its entirety.  A 35-36.

Plaintiff filed her opposition to the motion for summary judgment on June 26, 2023. A 49-370. On July 17, 2023, Defendant filed its reply to Plaintiff's opposition. A 383-404.

The Honorable William K. Sessions III (the "District Judge") issued the District Court's Decision and Order on November 13, 2023 (the "Decision"). A 409-41. In the Decision, the District Judge granted Defendant's motion for summary judgment and dismissed each of Plaintiff's causes of action. A 409-41. The District Judge's judgment was entered the same day, November 13, 2023. A 442.

The instant appeal followed with the filing of Plaintiff's Notice of Appeal on December 8, 2023. A 443.

**ARGUMENT**

**THE DISTRICT COURT'S DISMISSAL OF THE CLAIMS MUST BE
REVERSED BECAUSE THE DISTRICT COURT IMPROPERLY
CONCLUDED THAT THERE WERE NO GENUINE DISPUTES AS TO
ANY MATERIAL FACTS AND THAT THE DEFENDANTS WERE
ENTITLED TO JUDGMENT AS A MATTER OF LAW**

On an appeal from a district court's order on summary judgment, the Second

Circuit applies the same standards that governed the district court's consideration

of the summary judgment motion. *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537 (2nd

Cir. 2010). The Second Circuit has noted, "We review orders granting summary

judgment *de novo* after construing all evidence, and drawing all reasonable

inferences, in favor of the non-moving party, and focus on whether the district

court properly concluded that there was no genuine dispute as to any material fact

and the moving party was entitled to judgment as a matter of law." *Daniel v. T&M

Prot. Res., LLC*, 689 F. App'x 1, at *2 (2d Cir. 2017) (summary order) (citing

*Sotomayor v. City of New York*, 713 F.3d 163, 164 (2d Cir. 2013)).

The burden of the movant is to demonstrate "the <u>*absence*</u> of a genuine issue

of material fact . . . ." *Fischman v. Mitsubishi Chem. Holdings Am.*, 18-CV-8188

(JMF) (S.D. N.Y. Jul 26, 2023) (quoting *Chertkova v. Connecticut Gen. Life Ins.*,

92 F.3d 81, 87 (2d Cir. 1996)) (emphasis supplied). A dispute of fact is 'genuine'

if the evidence is such that a reasonable jury could return a verdict for the non-

moving party. *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir.

6

2009). The burden of showing that no genuine dispute of material fact exists rests on the party seeking summary judgment. *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 36 (2d Cir.1994).

"*Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.*" *Rupp v. City of Buffalo*, 21-1036 (2d Cir. Jan. 31, 2024) (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000) (emphasis added). Thus, "not only must there be no genuine dispute as to evidentiary facts, but *there must also be no controversy regarding inferences to be drawn from them.*" *Harris v. Provident Life and Acc. Ins. Co.*, 310 F.3d 73 (2d Cir. 2002) (emphasis added). The Second Circuit "has repeatedly emphasized the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010) (internal quotation marks omitted).

"Where an employer has acted with discriminatory intent, direct evidence of that intent will only rarely be available, so that affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). "Circumstantial evidence is not only sufficient, but may also be more certain,

satisfying and persuasive than direct evidence." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003).

## I.     SEX DISCRIMINATION

An inference of sex discrimination can arise from circumstances including, but not limited to, the employer's criticism of the plaintiff's performance in sex-related degrading terms, its invidious comments about others in the employee's protected group, the more favorable treatment of employees not in the protected group; and the sequence of events leading to the plaintiff's discharge. *Lillico v. Roswell Park Comprehensive Cancer Ctr.*, No. 21-CV-836-LJV, 2022 U.S. Dist. LEXIS 104215, *12 (W.D.N.Y. Jun. 10, 2022) (internal quotations omitted).

It is generally true that Title VII "does not set forth 'a general civility code for the American workplace,'" *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)). However, title VII is violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," *Doe v. Syracuse Univ.*, 22-2674 (2d Cir. Nov. 08, 2023) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21(1993) (citations and internal quotations omitted)), if there is a basis for imputing the hostile

8

environment to the employer. *See Williams v. N.Y.C. Hous. Auth.*, 61 F.4th 55 (2d Cir. 2023) ("when a supervisor wields the authority delegated to him by an employer . . . the supervisor's conduct is deemed to be that of the employer, and the employer is liable for that conduct.") (quoting *Perry v. Ethan Allen, Inc*., 115 F.3d 143, 152 (2d Cir.1997)). In general, an employer is presumed to be responsible where the perpetrator of the harassment was the plaintiff's supervisor. *See id.*; *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).

As to "whether an environment is 'hostile' or 'abusive,'" the United States Supreme Court in *Harris* stated that that matter "can be determined only by looking at *all the circumstances*," including the frequency of the discriminatory conduct, its severity, or whether it is physically threatening or humiliating. 510 U.S. at 23 (emphasis added). Moreover, "while psychological harm, like any other relevant factor, may be taken into account, no single factor is required." *Id*. "Because the analysis of severity and pervasiveness looks to the totality of the circumstances, 'the crucial inquiry focuses on the nature of the workplace environment as a whole.'" *Kaytor*, 609 F.3d 537 (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000)).

Regarding sex-based harassment, the "'harassing conduct need not be motivated by sexual desire,'" so long as it was motivated by gender. *Kaytor*, 609

F.3d at 547 (quoting *Raniola v. Bratton*, 243 F.3d 610, 617 (2d Cir. 2001)). "The question of whether a work environment is sufficiently hostile to violate Title VII is one of fact" for the jury." *Schiano v. Quality Payroll Systems, Inc.*, 445 F.3d 597 (2nd Cir. 2006) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 75 (2d Cir. 2001)); *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 901 (7th Cir. 2018). "[T]he environment need not reach the point of 'hellishness,' as some cases once argued. The Supreme Court standard dictates that the discrimination must be only so severe or pervasive so as to affect the terms and conditions of employment." *Id.*

Whether offensive language constitutes a hostile work environment "depends upon the quantity, frequency, and *severity* of those slurs, *considered cumulatively in order to obtain a realistic view of the work environment*." *Daniel*, 15-560-cv, at *2-3 (citing *Schwapp v. Town of Avon*, 118 F.3d 106, 110-11 (2d Cir. 1997); *Redd v. N.Y. Div. of Parole*, 678 F.3d 176 (2d Cir. 2012) ("even a single episode of harassment can establish a hostile work environment if the incident is sufficiently severe"); *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004) (same). "The court must take care, however, not to view individual incidents in isolation." *Redd*, 678 F.3d at 176. "The objective hostility of a work environment depends on the totality of the circumstances, viewed from the perspective ... of a reasonable person in the plaintiff's position, considering all the circumstances

10

[including] the social context in which particular behavior occurs and is experienced by its target." *Id*. (internal quotation marks omitted). Moreover, "a plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support her claim." *Cruz*, 202 F.3d at 570 (emphasis added).

Likewise, "*the line between boorish and inappropriate behavior and actionable sexual harassment . . . is admittedly indistinct, [and] its haziness counsels against summary judgment*." *Schiano*, 445 F.3d at 605 (internal quotations omitted) (emphasis added). Even where such "boorish" behavior is ambiguous as to its actionability, "[t]he interpretation of ambiguous conduct is 'an issue for the jury.'" *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 178 (2d Cir. 2012) (quoting *Gallagher v. Delaney*, 139 F.3d 338, 347 (2d Cir. 1998)); *see also Porter v. Dartmouth-Hitchcock Medical Center*, No. 20-3894, at *55 (Feb. 6, 2024) ("If there is evidence in the record that could make such other possible interpretations, more than mere speculation, the choice among them will be the responsibility of the jury, not the court.") (internal quotations omitted).

### a. Hostile work environment

In his Decision, the District Judge agreed with Plaintiff's argument that she established her *prima facie* case of a sex-based hostile work environment, concluding, "While the events alleged present a close question about the true

nature of Newbury's treatment, a reasonable jury could find that such treatment was sufficiently consistent and demanding as to unreasonably interfere with her ability to perform." A 438. However, the District Judge granted summary judgment dismissing Plaintiff's hostile work environment claim after concluding that Plaintiff failed to establish a "specific basis for imputing the conduct creating the hostile work environment to the employer." *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009).

On this issue, the District Judge noted that the analysis centers on whether the harasser is a supervisor "empowered to take tangible employment actions against the victim," in which the case the employer will be strictly liable, or merely a co-worker, which requires a showing of employer negligence, which showing of negligence may be made where the employer "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." A 439-40 (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013) and *Murray v. New York Univ. College of Dentistry*, 57 F.3d 243, 249 (2d Cir. 1995)); *see also Vance*, 570 U.S. at 431 (noting tangible employment actions include "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits").

However, while the District Judge correctly described the standard for liability regarding the actions of supervisors, the District Judge incorrectly applied

an older, higher standard for liability regarding the conduct of low-level coworkers in requiring that the employer "*knew* of the harassment but *did nothing* about it." A 439-40 (citing *Murray*, 57 F.3d at 249).

As Plaintiff noted in her opposition to summary judgment, and which the District Judge failed to acknowledge in his Decision, the Second Circuit has more recently clarified, "Where . . . a hostile work environment claim involves conduct by a co-worker, rather than by a supervisor, the employer is only liable for its own failure to exercise reasonable care to address the harassment. Accordingly, the test is whether (1) the employer 'failed to provide a reasonable avenue for complaint' or (2) 'it knew, or in the exercise of reasonable care *should have known*, about the harassment yet failed to *take appropriate remedial action*.'" *MacCluskey v. Univ. of Conn. Health Ctr.*, No. 17-0807-cv (2d Cir. Dec. 19, 2017) (quoting *Duch*, 588 F.3d at 762))) (emphasis added). Indeed, in hostile work environment claims, "[t]he question is whether [the employer] had *constructive notice* of the harassment," but was negligent in its duty to respond. *Id*.

This same negligence standard for attributing liability to a low-level coworker's conduct also applies to non-employees under both Title VII and the NYSHRL. The NYSHRL expressly provides:

> It shall be an unlawful discriminatory practice for an employer to permit unlawful discrimination against non-employees in its workplace. An employer may be held liable to a non-employee who is a contractor,

>subcontractor, vendor, consultant or other person
>providing services pursuant to a contract in the
>workplace or who is an employee of such contractor,
>subcontractor, vendor, consultant or other person
>providing services pursuant to a contract in the
>workplace, with respect to an unlawful discriminatory
>practice, when the employer, its agents or supervisors
>knew *or should have known* that such non-employee was
>subjected to an unlawful discriminatory practice in the
>employer's workplace, and the employer failed to *take
>immediate and appropriate corrective action*.  In
>reviewing such cases involving non-employees, the
>extent of the employer's control and any other legal
>responsibility which the employer may have with respect
>to the conduct of the person who engaged in the unlawful
>discriminatory practice shall be considered.

N.Y. Exec. L. § 296-D (emphasis added).  Regarding Title VII, the Second Circuit

held in *Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013), that essentially

the same standard applies:

>[W]e now adopt the well-reasoned rules of the Equal
>Employment Opportunity Commission ('EEOC') in
>imputing employer liability for harassment by non-
>employees according to the same standards for non-
>supervisory co-workers, with the qualification that we
>will consider the extent of the employer's control and any
>other legal responsibility which the employer may have
>with respect to the conduct of such non-employees." 29
>C.F.R. § 1604.11(e).
>
>     By analogy to the rules for non-supervisory co-
>workers, *see id*. § 1604.11(d), "the employer will be held
>liable only for its own negligence," and the plaintiff must
>demonstrate that the employer "failed to provide a
>reasonable avenue for complaint or that it knew, or in the
>exercise of reasonable care should have known, about the
>harassment yet failed to take appropriate remedial

> action." *Duch*, 588 F.3d at 762 (internal quotation marks
> omitted). In determining the appropriateness of an
> employer's response, we look to whether the response
> was "immediate or timely and appropriate in light of the
> circumstances, particularly the level of control and legal
> responsibility [the employer] has with respect to [the
> employee's] behavior." *Crist v. Focus Homes, Inc.*, 122
> F.3d 1107, 1111 (8th Cir. 1997).

708 F.3d at 124 (original citations and quotations included).

Moreover, this Court has held that liability may be extended to the employer

for a tangible employment action that is taken by a higher-level supervisor, even

where the supervisor acted without discrimination, if the supervisor's decision in

taking the employment action was influenced by a low-level employee's

discrimination. *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 273-74

(2d Cir. 2016). The Court has applied the same negligence standard in these

situations, noting, "We see no reason why *Ellerth* . . . should not also be read to

hold an employer liable under Title VII when, through its own negligence, the

employer gives effect to the retaliatory intent of one of its—even low-level—

employees." *Vasquez*, 835 F.3d at 273-74.

The Court agreed with the holding of the First Circuit that "an employer can

be held liable under Title VII if: the plaintiff's co-worker makes statements

maligning the plaintiff, for discriminatory reasons and with the intent to cause the

plaintiff's firing; the co-worker's discriminatory acts proximately cause the

plaintiff to be fired; and the employer acts negligently by allowing the co-worker's

15

acts to achieve their desired effect though it knows (or reasonably should know) of the discriminatory motivation." *Vasquez*, 835 F.3d 274 (quoting *Velazquez-Perez v. Developers Diversified Realty Corp.*, 753 F.3d 265, 273-74 (1st Cir. 2014)). Thus, because the same negligence standard for imputing liability to the employer for a lower-level coworker's conduct also applies to non-employees, it reasonably follows that an employer should also be liable under Title VII where a non-employee's discriminatory acts proximately cause the termination of the plaintiff. *See id*.

Turning to the instant matter, the District Judge concluded,

> The relationship of other alleged incidents to gender are *unclear*. Newbury does not dispute the facts underlying her performance evaluations. While *some conduct by supervisors may have been harsh,* as with the threat to cut off Newbury's finger when she placed it on the trigger of her weapon, the connection to gender in those instances is, on the current record, speculative. It is *similarly unclear* whether insults and comments about whether Newbury should be at the Academy were a part of the training environment or, as alleged, evidence of workplace hostility on the basis of gender.

A 473 (emphasis added).

While Deputy Grapes was technically not an NFPD employee, he indisputably was, for the purposes of Plaintiff's training at the Academy, one of her supervisors, which fact the District Judge acknowledged in his Decision. *See* A 473 ("While some conduct by *supervisors* may have been harsh, as with the

16

threat [by Deputy Grapes] to cut off Newbury's finger when she placed it on the trigger of her weapon . . . .") (emphasis added)).  Therefore, insofar as the District Judge concluded the relationship of "other alleged incidents" such as Deputy Grapes' knife threat to Plaintiff's gender was "unclear," this is precisely the type of "haziness" that "counsels against summary judgment."  *Schiano*, 445 F.3d 605; *Gallagher*, 139 F.3d 347 ("[t]he interpretation of ambiguous conduct is an issue for the jury.") (internal quotations omitted)); *see also Porter*, No. 20-3894, at *55 (where key evidence is "inconclusive," summary judgment is not appropriate).  Summary judgment on this issue was thus inappropriate by the District Judge's very acknowledgement that the evidence was "unclear."

The District Judge also concluded that no reasonable juror could find that Defendant either knew (direct knowledge) or should have known (constructive knowledge) about her complaints of sex-based harassment, and that therefore that Defendant was negligent in failing to take appropriate action in response.  A 476.  The District Judge rejected Plaintiff's argument that a reasonable juror could attribute to Defendant a general corporate knowledge of her complaints of sex-based harassment to Keith Kennedy.  A 470-71.

The District Judge correctly noted, "In the Second Circuit, a plaintiff need not show that the ultimate decision-maker knew about her protected activity, and may instead rely on the employer's 'general corporate knowledge.'"  A 470

(quoting *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000).

More recently than the *Gordon* decision, this Court has clarified, "A defendant's

knowledge may be shown through either 'general corporate knowledge' of the

protected activity *or the defendant's agents having knowledge of the protected*

*activity*." *Bhatti v. Physician Affiliate Grp. of N.Y.*, No. 21-2522, 2022 U.S. App.

LEXIS 33909, at *3 (2d Cir. 2022). However, the District Judge's conclusions of

fact were erroneous, as they ignored or glossed over several key facts presented at

summary judgment.

    Specifically, Defendant acknowledged in its motion papers:

> The City requires that all newly-hired police officers
> successfully complete training at an accredited police
> academy. For this purpose, NFPD uses Niagara County
> Law Enforcement Academy ("NCLEA" or "Academy").
> NCLEA is a multi-jurisdictional police academy open to
> all law enforcement agencies in New York State. *It is co-*
> *sponsored by the City and by the Niagara County*
> *Sheriff's Office* ("NCSO"); accordingly, each session of
> *the Academy is typically co-directed by one individual*
> *from NFPD and one individual from NCSO*.

A 184 (emphasis added). This fact was undisputed. A 370. It was also undisputed

that the Academy's Rules and Regulations, which were ostensibly promulgated

and enforced by the co-directors (which, again, included NPFD Detective Faso at

the time, *see* A 38) provided that "[a]ll recruits/students are required to comply

with . . . the Academy rules and regulations and code of conduct," and that

"[f]ailure to comply with the rules and regulations or code of conduct contained

herein will result in disciplinary actions and appropriate penalties will be assessed." A 62.

One particularly relevant provision of these mandatory Rules and Regulations states thusly: "The chain of command of this academy is Co-Director(s), Training Instructor, Guest Instructors, Class President and Recruit/student." A 62. Mr. Kennedy was a fellow recruit who was also appointed to be Class President by the two academy directors, one of whom was Detective Faso. A 150. Although at his deposition Mr. Kennedy denied that he was a part of the chain of command expressly outlined in the Rules and Regulations, he also testified that he did not recall ever seeing the Rules and Regulations as part of his training at the Academy. A 152-53.

At his deposition, NFPD Superintendent DalPorto was asked to clarify the role of the Class President, and he responded, "the president kind of is the liaison between the recruits and the directors and he – he or she should have the most interaction with the co-directors in terms of giving them downward directions to the recruits or the recruits needing to let the directors know something," and that if a recruit had a specific issue, that recruit traditionally was supposed to bring it to the attention of the class president _before_ going to the co-director. A 221.

Defendant clearly felt these Rules and Regulations important enough to expressly require all recruits to adhere to their provisions. These provisions

specifically indicated that the Class President was part of the chain of command. This provision, like all those included in the Rules and Regulations, was mandatory. A 62.

Meanwhile, Plaintiff testified she was well-aware of the chain of command during her time at the Academy (a fact that was undisputed), and she chose to complain about at least one sex-based offensive incident to Mr. Kennedy precisely *because* he was Class President. A 321. Plaintiff credibly testified she believed that it was Mr. Kennedy's responsibility to pass along this complaint up the chain of command. A 321. Even Superintendent DalPorto himself agreed this was the appropriate thing for a recruit to do before she would have gone to one of the co-directors of the Academy. A 221. Plaintiff's belief that her complaint would travel up the chain of command was therefore certainly reasonable, precisely because of the mandatory nature of the Rules and Regulations, Superintendent DalPorto's testimony, and because of the self-proclaimed "paramilitary" nature of the Academy itself. A 185.

Therefore, the District Judge's conclusion that "no such juror would deem Kennedy an agent of the City" misses the point: even if Mr. Kennedy was not specifically an employee of Defendant, he was nevertheless a part of Defendant's chain of command for the purposes of forwarding Plaintiff's complaints, and therefore, it was error for the District Judge to conclude that the evidence did not

establish Defendant had constructive, or "general corporate" knowledge of her

complaints. Accordingly, as it was undisputed that Defendant did nothing in

response to Plaintiff's complaint about receiving a text message containing a

picture of a flashlight with a vagina, it was clear error for the District Judge to

conclude no reasonable juror could find Defendant was at least negligent for

failing to respond in _any_ manner, let alone a reasonable manner, to Plaintiff's

complaint. A 247-249, 320.

Likewise, the District Judge erred in concluding that Plaintiff failed to avail

herself of reasonable avenues for complaining about the discrimination and

harassment she endured. A 439. Specifically, the District Judge concluded,

> Newbury again contends that she was compelled to
> report to Kennedy, that she believed that her complaint
> would work its way up the chain of command, and that
> the City therefore bears liability for her treatment. This
> contention is undermined by a series of undisputed facts.
> First, Newbury was a City employee, and the City had its
> own reporting policies and procedures. Newbury did not
> avail herself of those procedures. Second, while recruits
> were encouraged to report issues to their Class President,
> nothing in the Academy rules barred Newbury from
> speaking directly with the co-directors, other
> administrators, or someone at the City. Third, Newbury
> testified that she spoke with Detective Faso about issues
> at the Academy, yet nothing in the record suggests that
> she raised with him allegations of severe or pervasive
> conduct based upon her gender.

A 439-40 (internal citations and quotations omitted). But again, the District

Judge's analysis here misses the point. While it was undisputed that Plaintiff did

not report the discrimination and harassment via the City's own discrimination and harassment policies, it is readily apparent that she chose not to do so because she reasonably believed her complaints to Mr. Kennedy would ultimately land with the co-directors of the Academy, per the chain of command expressly outlined in the Academy's rules. *See* A 182-83, 370. Moreover, even though Plaintiff did not avail herself of one particular set of procedures for reporting discrimination, this does not mean she failed to avail herself of *any* "reasonable avenue for complaint," particularly when another option was available to her. *See Murray*, 57 F.3d at 249; MacCluskey, 17-cv-0807, at *9 ("the existence of an anti-harassment policy is not dispositive on the issue of whether the employer exercised reasonable care to prevent and correct harassing behavior."). In short, it is not Plaintiff's fault that the chain of command failed her.

Finally, the District Judge concluded, "Statements by Superintendent DalPorto during a single meeting, each of which arguably related to performance rather than gender, are insufficient to support a claim of a hostile work environment." A 476. However, the District Judge entirely fails to note the specific words Superintendent DalPorto cast toward Plaintiff during this meeting, which plainly had nothing to do with her performance whatsoever (nor could they, as the decision to terminate Plaintiff had already been made prior to that meeting). These included Superintendent DalPorto calling Plaintiff a "piece of shit" and

telling her that "he wasn't going to let someone stupid like [her] get one of his boys hurt on the streets." A 205, 382. Significantly, Defendant *did not dispute* that Superintendent DalPorto made these statements. A 382, 386. Here, the decisionmaker specifically referenced gender in the termination meeting, but even if these words were "arguably" related to performance rather than gender, as noted previously, it is well-established in this Circuit that even where such inappropriate behavior is ambiguous as to its actionability, "[t]he interpretation of ambiguous conduct is 'an issue for the jury.'" *Gallagher*, 139 F.3d at 347. Thus, it was improper for the District Court to grant summary judgment on this claim, given the case law unequivocally in Plaintiff's favor and the numerous issues of fact that should have been reserved for trial.

### b. Disparate treatment

In his Decision, the District Judge agreed that Plaintiff established her *prima facie* case for discrimination, as there was evidence to demonstrate that Plaintiff was a member of a protected class (female), was qualified for her position (she was due to graduate from the Academy shortly before her termination and had met all of the graduation requirements), suffered an adverse employment action (termination), and her termination occurred under circumstances giving rise to an inference of discrimination (DalPorto admitting he fired her to protect "his boys" on the streets while also calling Plaintiff "stupid" and a "piece of shit"). A 426;

23

*see also Walsh v. New York City Hous. Auth*., 828 F.3d 70, 74 (2d Cir. 2016).

However, the District Judge granted summary judgment on this claim after

concluding that Defendant set forth a legitimate, non-discriminatory reason for its

decision to terminate Plaintiff and that Plaintiff failed to demonstrate that

Defendant's proffered explanation was pretext for discrimination.  A 427-33.

If the defendant offers a legitimate, nondiscriminatory explanation for its

action, the plaintiff bears the final burden of demonstrating that defendant's reason

was in fact a pretext for unlawful discrimination.  *See McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792, 804 (1973).  With respect to sex discrimination claims, the

ultimate question here is whether a discriminatory purpose "was 'a motivating

factor' for an adverse employment decision," even if other factors also motivated

the decision.  *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 174 (2009) (quoting 42

U.S.C. § 2000e–2(m)); *Lenzi v. Systemax, Inc*., 944 F.3d 97, 108 (2d Cir. 2019).

An inference of discriminatory motive can be derived from many

circumstances, including, but not limited to, "the employer's criticism of the

plaintiff's performance in [protected-class-related] degrading terms; [2] its

invidious comments about others in the employee's protected group; [3] the more

favorable treatment of employees not in the protected group; [4] the sequence of

events leading to the plaintiff's discharge [; or 5] . . . when an employer replaces a

terminated or demoted employee with an individual outside the employee's

protected class." *Lillico*, No. 21-CV-836-LJV, 2022 U.S. Dist. LEXIS 104215, at *12 (internal quotations omitted).

Here, the question of whether Plaintiff's gender was at least included among the motivating factors that resulted in Superintendent DalPorto's decision to terminate her was at best an unresolved question of fact. There was no allegation by either party that any of the male recruits in Plaintiff's class (in which she was the sole female) similarly received the kind of "harsh" treatment the District Judge acknowledged in his Decision. *See* A 437. These were undisputed facts Plaintiff noted in her opposition to summary judgment. In fact, none of the specific instances of verbal or physical abuse Plaintiff suffered were similarly directed towards any of the male recruits. *See id*.

Moreover, Deputy Grapes wrote in his Administrative Report from March 29, 2016, which Superintendent DalPorto admittedly reviewed before terminating Plaintiff's employment, that Plaintiff "cannot control her emotions when she is put even under low amounts of stress." A 40-41, 85 (Superintendent DalPorto acknowledging he reviewed Deputy Grapes' report). This appears to have been the basis for Detective Faso's comment in his own memo to Superintendent DalPorto just weeks later that Plaintiff "tends to become overly emotional during stress situations." A 94. While Defendant disputed that anyone at the Academy harbored any gender bias, there is at least a clear dispute of material fact as to

whether Deputy Grapes, or any other supervisor for that matter, were influenced by any such bias in writing so negatively about Plaintiff to or Superintendent DalPorto, ultimately leading to her dismissal.

Here, the instances of Deputy Grapes' criticism of Plaintiff as overly emotional, Officer Pappas' aspersions that Plaintiff looked "like an idiot" when she wore mascara and told her to not "wear that again, you're not here to impress anybody," the Midterm Report criticizing Plaintiff for being "prone to breaking down and crying," Plaintiff being told she looked "like a bag of ass" when wearing a men's uniform that did not fit her, and the multiple times Plaintiff was called a "bitch," all clearly emanate from gender-based animus and negative stereotypes. A 85, 311, 329-30, 365. These are precisely the types of "degrading terms" and "invidious comments" that raise inferences of a discriminatory motive. *Lillico.*, No. 21-CV-836-LJV, 2022 U.S. Dist. LEXIS 104215, at *12.

Furthermore, Plaintiff's male peers were also treated more favorably than her, particularly Mr. Maio, who was allowed to graduate from the Academy and was subsequently made an NFPD Officer, despite the undisputed fact Plaintiff outperformed Mr. Maio on most of the written examinations and the undisputed fact Mr. Maio failed the physical fitness test and was expressly warned that his test average was below the cumulative minimum average required. A 252-65, 277, 369. Meanwhile, despite several other male recruits struggling with training at

times, including Mr. Maio, Mr. Ciccarelli, and Mr. Travis, Plaintiff was the only recruit who was physically threatened with a knife by an instructor (A 12), grabbed by the arm and tossed to the ground by an instructor (A 337-38), given an inaccurately low score on the Emergency Vehicles Operation Course by an instructor (A 343-44), or was urged by her instructors, repeatedly, to quit. A 300-301. These incidents are precisely the kind of "sequence of events" and "more favorable treatment of employees not in [Plaintiff's] protected group" that raise inferences of a discriminatory motive, particularly as those instructors *Lillico.*, No. 21-CV-836-LJV, 2022 U.S. Dist. LEXIS 104215, at *12.

Furthermore, because the question of whether at least one of Plaintiff's supervisors harbored a gender-based animus is clearly a question that should have been reserved for the jury, rather than for the District Judge, it likewise remains an unresolved question of fact whether Deputy Grapes' gender-based motive infected the Administrative Reports he wrote, which reports Superintendent DalPorto relied upon in making the decision to terminate Plaintiff's employment. A 205 ("In making the decision to terminate Plaintiff's employment, Superintendent DalPorto considered numerous written reports and memoranda from instructors and the co-directors, verbal reports from instructors and co-directors, and any other information he learned about Plaintiff's performance."). Moreover, Plaintiff was the only recruit ever to successfully complete all the requirements of the Academy

and yet still get terminated.  *See* A 238.  In fact, Detective Faso himself testified that Plaintiff successfully completed all the elements of the Academy.  *Id*.

All of the above demonstrates that Defendant's proffered non-discriminatory reason for terminating Plaintiff was pretextual.  At a minimum, the question of pretext is an unresolved issue, particularly as the District Judge unilaterally credited the instructor reports when the credibility of witnesses is not subject to the District Judge's assessment at summary judgment.  Insofar as the District Judge overlooked the evidence that at least one of those instructor reports may have been tainted with discriminatory bias, it was not for the District Judge to determine that no reasonable jury could conclude that the ultimate decision by Superintendent DalPorto was not similarly tainted.  Therefore, it was plainly improper for the District Judge to grant summary judgment on this issue.

## II.    RETALIATION

Retaliation claims under Title VII and the NYSHRL are all analyzed under the same burden-shifting analysis outlined in *McDonnell Douglas*, 411 U.S. 792. *See Summa*, 708 F.3d at 125; *Massaro v. New York City Dep't of Educ.*, No. 21-266-cv, 2022 U.S. App. LEXIS 15143, *2 (2d Cir. June 2, 2022) (summary order). "To make out a prima facie case of retaliation, a plaintiff must make four showings: that '(1) she engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took adverse employment action against her; and

(4) a causal connection exists between the alleged adverse action and the protected activity.'" *Summa*, 708 F.3d at 125 (quoting *Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 608 (2d Cir. 2006)).  Once a *prima facie* case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action.  *Id.*  If the employer demonstrates a legitimate, non-discriminatory reason, then "[t]he burden shifts . . . back to the plaintiff to establish through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation.'" *Id.*

Regarding the second element of the *prima facie* analysis for retaliation claims, the test is similar to that concerning an employer's awareness of harassment, as noted above in Point I (a), *supra*, in that "[a] defendant's knowledge may be shown through either 'general corporate knowledge' of the protected activity or the defendant's agents having knowledge of the protected activity." *Bhatti v. Physician Affiliate Grp. of N.Y.*, No. 21-2522, 2022 U.S. App. LEXIS 33909, at *3 (2d Cir. 2022); *Gordon*, 232 F.3d at 116; *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013); *see also Summa*, 708 F.3d at 125 (applying same framework to NYSHRL retaliation claims).  "Neither this nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged

in a protected activity." *Gordon*, 232 F.3d at 116; *see also Galdamez v. Potter*, 415 F.3d 1015, 1022 (9th Cir. 2005) ("An employer may be held liable for the actionable third-party harassment of its employees where it ratifies or condones the conduct by failing to investigate and remedy it after learning of it.").

This Court has noted that while "[t]he lack of knowledge on the part of particular *individual agents* is admissible as some evidence of a lack of a causal connection, countering plaintiff's circumstantial evidence of proximity or disparate treatment, . . . A jury, however, can find retaliation even if the agent denies direct knowledge of a plaintiff's protected activities, for example, so long as the jury finds that the circumstances evidence knowledge . . . ." *Gordon*, 232 F.3d at 117.

Regarding the fourth element, i.e. causation, this Court "has consistently held that proof of causation can be shown . . . indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct . . . ." *Gordon*, 232 F.3d at 117.

The District judge granted summary judgment in favor of Defendant on Plaintiff's retaliation claim, concluding that Plaintiff's complaint to the Class President, Mr. Kennedy, did not reach Superintendent DalPorto or any other employee of Defendant. A 434. Plaintiff noted in her opposition to summary judgment that because Mr. Kennedy was the Class President, he was in the chain

of command and that therefore Defendant had constructive knowledge of her complaints.

Again, the District Judge determined that that no reasonable juror could find that Defendant either knew or should have known about her complaints of sex-based harassment, and that therefore it could not be determined that Defendant had a retaliatory motive in terminating her from the Academy. A 440. The District Judge rejected Plaintiff's argument that a reasonable juror could attribute to Defendant a general corporate knowledge of her complaints of sex-based harassment to Keith Kennedy. A 434-35.

In his analysis, the District Judge correctly noted, "In the Second Circuit, a plaintiff need not show that the ultimate decision-maker knew about her protected activity, and may instead rely on the employer's 'general corporate knowledge.'" A 434 (quoting *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000). More recently than the *Gordon* decision, this Court has clarified, "A defendant's knowledge may be shown through either 'general corporate knowledge' of the protected activity *or the defendant's agents having knowledge of the protected activity*." *Bhatti*, No. 21-2522, 2022 U.S. App. LEXIS 33909, at *3. However, the District Judge's conclusions of fact were erroneous, as they ignored or glossed over several key facts presented at summary judgment.

As noted in Point I (a), *supra*, Defendant acknowledged in its motion papers that the Academy was co-sponsored by the City and the NCSO and co-directed by officers from both the City and NCSO.  A 184.  This fact was undisputed.  A 370.  And as noted in Point I (a), *supra*, it was undisputed that the Academy's Rules and Regulations were mandatory on all recruits to comply, and that those same rules provided for a chain of command that included the Class President .  A 62.  Superintendent DalPorto was testified that the Class President was the liaison between the recruits and the Academy directors, and that recruits traditionally were supposed to bring concerns to the attention of the class president *before* going to the co-director.  A 221.  Detective Faso essentially confirmed this in his testimony.  A 249.  And because Defendant was responsible for ensuring the recruits received copies of the Rules and Regulations, even if Mr. Kennedy claims he was ignorant of his role in the chain of command, then clearly Defendant was responsible for this failure.  *See* A 152-53.  In short, it was Defendant's responsibility, rather than Plaintiff's, to ensure that her complaints traveled up the chain of command.

Moreover, the District Judge even acknowledged that "a reasonable juror might consider Kennedy an agent of the Academy and attribute to it a general corporate knowledge," yet failed to consider the undisputed fact that *the Academy was co-managed by Defendant*.  A 38, 184.  Thus, if a reasonable juror might attribute a general corporate knowledge to the Academy, it follows that a

reasonable juror might likewise attribute that same general corporate knowledge to Defendant. The District Judge's conclusion incorrectly treats Defendant and the Academy as two unrelated entities and assumes that knowledge could only be attributed to one without the other. This conclusion does not make sense. Therefore, it was error for the District Judge to conclude that the evidence did not establish Defendant had constructive, or "general corporate" knowledge of Plaintiff's complaints.

Finally, the District Judge concluded that Plaintiff could not overcome the City's proffered non-retaliatory reason for terminating her from the Academy. A 435. However, as noted above in Point I (b), *supra*, Defendant's proffered non-discriminatory reasons for terminating Plaintiff are without merit or, at best, raise genuine disputes over issues of fact that should have precluded summary judgment.

Additionally, as the time between Plaintiff's entering the Academy and her termination was very short (less than four months in total), the timing of Plaintiff's complaints to Mr. Kennedy was indisputably close to her termination. A 182, 205 (noting Plaintiff's start date of February 1, 2016 and termination date of May 26, 2016). Such a close temporal proximity clearly establishes a causal connection for the purposes of her retaliation claim. *See Gordon*, 232 F.3d at 117. The District Judge failed to address this in granting summary judgment. A 435. The District

Judge also failed to address the "circumstantial evidence such as disparate treatment of fellow employees" which also established such a causal connection, including the plainly favorable treatment Plaintiff's male peers received throughout their time at the Academy, as noted in Point I (b), *supra*. *See Gordon*, 232 F.3d at 117; A 435. Therefore, the District Judge erred in granting summary judgment on this claim, as the undisputed evidence presented numerous issues of fact that should have been reserved for a jury to decide.

## CONCLUSION

For the aforementioned reasons, Plaintiff respectfully requests this Court vacate the judgment of the District Court dismissing Plaintiff's claims and permit those causes of action to proceed to a trial where their respective unresolved issues of fact may be more fully resolved by a jury.

Dated:  Cheektowaga, NY   Respectfully Submitted,
   March 29, 2024

           s/Harvey P. Sanders
           Harvey P. Sanders
           SANDERS & SANDERS
           *Attorneys for Plaintiff-Appellant*
           401 Maryvale Drive
           Cheektowaga, NY 14225
           Telephone:  (716) 839-1489
           Facsimile:  (716) 839-1512
           harvey.sanders@wnyemploymentlaw.com

## CERTIFICATE OF COMPLIANCE

This brief complies with the page limitation of Fed. R. App. P. 32(a)(7)(A)

and the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) and Local Rule

32.1(a) because this brief does not exceed 13,000 words, excluding the parts of the

brief exempted by Fed. R. App. P. 32(f) and Fed. R. App. P. 32(a)(7)(B)(ii),

according to Microsoft Word's Word Count function.  This brief complies with the

typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements

of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally

spaced serif typeface using Microsoft Word in plain Times New Roman 14-point

font, using italics for case names or emphasis only.

Dated:  Cheektowaga, NY
      March 29, 2024

          s/Harvey P. Sanders
          Harvey P. Sanders
          SANDERS & SANDERS
          *Attorneys for Plaintiff-Appellant*
          401 Maryvale Drive
          Cheektowaga, NY 14225
          Telephone:  (716) 839-1489
          Facsimile:  (716) 839-1512
          harvey.sanders@wnyemploymentlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused the foregoing Brief with Special Appendix to be filed with the Clerk of the Court of the United States Court of Appeals for the Second Circuit via the court's electronic filing system and e-mail on March 29, 2024 and caused true and accurate copies of the same to be timely served upon Defendant-Appellee's counsel via electronic filing, e-mail, and regular mail.

<div style="margin-left:40%">

<u>s/Harvey P. Sanders</u>
Harvey P. Sanders
SANDERS & SANDERS
*Attorneys for Plaintiff-Appellant*
401 Maryvale Drive
Cheektowaga, NY 14225
Telephone:  (716) 839-1489
Facsimile:  (716) 839-1512
harvey.sanders@wnyemploymentlaw.com

</div>

# 23-7976

IN THE

## United States Court of Appeals

FOR THE SECOND CIRCUIT

ASHLEY NEWBURY,

*Plaintiff - Appellant*,

- versus -

CITY OF NIAGARA FALLS (NIAGARA FALLS POLICE
DEPARTMENT),

*Defendant - Appellee.*

ON APPEAL FROM A JUDGMENT AND ORDER OF THE UNITED STATES
DISTRICT COURT FOR THE WESTERN DISTRICT OF NEW YORK

# SPECIAL APPENDIX TO APPELLANT'S BRIEF

SANDERS & SANDERS
HARVEY P. SANDERS
*Attorney for Plaintiff-Appellant*
401 Maryvale Drive
Cheektowaga, NY 14225
Telephone: (716) 839-1489
Facsimile: (716) 839-1512
Email:
harvey.sanders@wnyemploymentlaw.com

Printed on recycled paper

## TABLE OF CONTENTS

| Document Description | Volume | Page (begins with "SA") |
|---|---|---|
| Memorandum Decision and Order ………………..... | I | 1 |
| The New York State Human Rights Law ..………… | I | 34 |
| Title VII of the Civil Rights Act of 1964...…………… | I | 36 |

UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

Ashley Newbury,                )
                               )
          Plaintiff,           )
                               )
     v.                        )     Case No. 1:17-cv-754
                               )
City of Niagara Falls,         )
                               )
          Defendant.           )

## OPINION AND ORDER

Plaintiff Ashley Newbury brings this action against Defendant City of Niagara Falls claiming unlawful discrimination and retaliation on the basis of sex.  Newbury alleges that while employed by the Niagara Falls Police Department ("NFPD") she was subjected to discrimination and a hostile work environment during her police academy training, and was terminated in retaliation for registering a complaint about her treatment. Defendant submits that Newbury was fired for poor performance, and that the ultimate decision-maker was unaware of her claims. Pending before the Court is Defendant's motion for summary judgment.  For the reasons set forth below, the motion for summary judgment is granted.

## Factual Background

Newbury was hired by the NFPD as a police officer on February 1, 2016, subject to a one-year probationary period. The City of Niagara Falls required all newly-hired police

officers to successfully complete training at the Niagara County
Law Enforcement Academy ("Academy" or "NCLEA").  Newbury
attended the spring 2016 Academy, which was co-directed by then-
NFPD Detective John Faso and Niagara County Sheriff's Office
("NCSO") Lieutenant Aaron Schultz.  Students included recruits
from law enforcement agencies across the region.  The parties
dispute whether Newbury's Academy class had 13 or 14 recruits,
but there is no dispute that Newbury was the only female in the
class.

Training at the Academy included defensive tactics,
physical training, emergency vehicle operations, firearms
training, and first responder training.  Instruction involved
classroom sessions and practical, reality-based scenarios.
Training took place in a paramilitary structure, with recruits
referred to by number rather than name and officers addressed by
either their full name, "sir" or "ma'am."  Defendant submits
that the Academy resembled a military-style boot camp.  ECF No.
44-1 at 2-3.

On February 3, 2016, NCSO Investigator J. Andres reported
that Newbury was unable to perform the "break fall" portion of
her training and "appeared to be ignoring the advice and
instruction of the instructors, failing to complete the
technique even with one on one instruction."  He also noted that
the entire class was disciplined because of Newbury's

consistently poor form.  ECF No. 44-7.  On February 9, 2016,
Andres reported that Newbury was unable to perform the "wrist
twist" or "wrist throw" portion of her training, again despite
one-on-one instruction.  His report stated that Newbury "did not
appear to be paying attention to instruction" and that the class
had once again been disciplined because of her poor performance.
ECF No. 44-8.

On February 10, 2016, Detective Faso reported that Newbury
was observed to be crying and, when asked about the problem,
stated that she was "feeling overwhelmed" during instruction.
Detective Faso and Lieutenant Schultz spoke with Newbury and
reportedly reassured her that such feelings were not unusual and
that things should improve after she became accustomed to the
Academy routine.  ECF No. 44-9.

On February 17, 2016, Investigator Andres reported that
Newbury performed "below expectations and standards in almost
every respect" during boxing training.  According to the report,
Newbury "did not execute any punches in the manner in which she
was taught prior, and was unable to protect herself even from
the weakest of punches.  Ms. Newbury appeared as if she would
give up or run away from any actual fight in a real life
situation."  ECF No. 44-10.

The following week, Detective Faso and Lieutenant Schultz
informed Newbury by memo that her test average for the Use of

Force portion of her training was 79%, while the required
minimum was 85%.  Their memo also stated that she would be given
remedial training and the opportunity to take additional tests
to bring up her average.  ECF No. 44-11.

On February 25, 2016, Investigator Andres issued another
report, this time relating to Newbury's performance on the
"front choke escape" exercise.  The report documented her
inability to perform the maneuver, her alleged lack of focus and
poor effort, and the resulting discipline of the entire class.
Each time Inspector Andres wrote such a report, Newbury signed
it in acknowledgement.  ECF No. 44-12.

Newbury continued to receive reports critical of her
performance through the conclusion of training in late May 2016.
Defendant submits that she was the subject of at least 15 memos
or reports authored by at least seven different instructors.
ECF No. 44-1 at 4-5.

A March 3, 2016 memo stated that Newbury had "proven time
and again that she cannot perform most tasks independently
without support from her instructors."  ECF No. 44-13.  On March
16, 2016, Investigator Andres wrote that "Ms. Newbury does not
appear to be developing or improving in any discernable or
measurable way."  ECF No. 44-14.  On March 29, 2016, another
trainer opined that Newbury was "suffering from a sever[e] lack
of effort and understanding."  ECF No. 44-16.  A report of that

4

same date stated that Newbury "has proven that she cannot apply the most basic techniques and tactics that have been taught to her," failed to follow instructions, and would be unable "to protect herself in a highly stressed environment."  ECF No. 44-17 at 1-2.  In early April, Newbury was provided six hours of remedial training on defensive tactics.  ECF No. 44-19.

On April 13, 2016, according to a memo written by Detective Faso, recruit Class President Keith Kennedy approached him privately and explained that the class was afraid to attend firearms training with Newbury due to her lack of sound tactics and safety.  Detective Faso and the lead firearms instructor decided to assign an instructor to shadow Newbury during firearms training.  ECF No. 44-20.

In an undated memorandum, Deputy Lisa C. Oliveri reported that Newbury had failed the Professional Traffic Stop portion of training.  According to Deputy Oliveri, Newbury was unable to perform each step of the training independently.  Her failures included an inability to recognize and respond to the threat of a weapon.  ECF No. 44-21.  Defendant notes that Deputy Oliveri is female.

Newbury's mid-term report stated that she was "failing to grasp basic concepts" and was "prone to breaking down and crying during difficult times of instruction both in the classroom and during proficiency areas."  ECF No. 44-18 at 2.

On May 17, 2016, Newbury participated in a series of
simulated, real-life scenarios.  A report authored by Lieutenant
Schultz described one scenario involving an emotionally
disturbed person.  When the individual grabbed a gun, Newbury's
partner attempted to subdue him.  Instead of assisting her
fellow recruit, Newbury pulled her gun and fired three rounds,
striking only her partner.  ECF No. 44-24 at 2.  In another
scenario involving a citizen drawing a gun, Newbury "flinched
and turned her back."  *Id.* at 1.  A memo from Lieutenant Schultz
cited "the catastrophic consequences from Recruit Newbury's
response to a man with a gun," and opined that "the decisions
Recruit Newbury made were catastrophic to the ideals and
fundamentals of police work."  *Id.* at 1-2.

In a memo to Superintendent DalPorto dated May 17, 2016,
Detective Faso explained that although Newbury had been able to
meet minimum standards after remedial training in many areas, he
had concerns about her ability to function in real-world
situations.  Detective Faso expressed his opinion,

> as a twenty-one year veteran of Law Enforcement and
> Co-Director of the NCLEA, that although with continued
> remediation, recruit Newbury was able to meet Academy
> standards, she is unable to retain the information and
> demonstrate continued proficiency in these areas for
> any length of time.  I further believe that at this
> point recruit Newbury would be a liability to herself,
> other Law Enforcement and[] the public if placed on
> duty.

ECF No. 44-23 at 2.

6

In a May 20, 2016 meeting with Newbury and Detective Faso, Superintendent DalPorto shared Detective Faso's concerns.  The memo memorializing the meeting noted that, according to Detective Faso, Newbury took no responsibility for her performance and instead blamed her classmates.  Superintendent DalPorto informed Newbury that a decision would be made in the near future, and that termination was a possibility.  ECF No. 44-25.  Her employment was terminated on or about May 26, 2016.  ECF No. 44-1 at 4.

Newbury notes that she completed all training requirements of the Academy successfully, and that she was due to receive a passing final grade.  Her mid-term score was equal to or higher than nine other recruits, and her final exam score was equal to or higher than ten other recruits.  Her proficiency average was higher than one other recruit.  ECF No. 49-7.  She further claims that during the termination meeting, DalPorto called her a "piece of shit."  ECF No. 49-5 at 75.

Newbury's Verified Complaint focuses on her treatment at the Academy.  For example, she alleges that on or about February 3, 2016, co-recruit Sebastian Czajka harassed her during a punishment run, screaming at her from behind to go faster.  ECF No. 1 at 3.  Newbury later testified that Czajka yelled, "speed it up bitch, let's go."  The word "bitch" was used multiple

7

times during the run, and according to Newbury's testimony, Czajka "continued to say things until I went into the women's section of the locker rooms."  ECF No. 49-5 at 18.

On or about February 17, 2016, Deputy Bull allegedly called Newbury aside, asked why she was present and told her that she needed to quit.  ECF No. 1 at 3.  Newbury submits that Deputy Bull did not tell any of the male recruits to quit even though some had failed the physical fitness test.  Newbury also notes that, to that point, she had outperformed one fellow recruit on most written examinations.  Newbury testified that Bull was "[c]onstantly telling me that, you know, I need to quit and I was going to be hurt if I didn't."  ECF No. 49-5 at 21.

That same day, Officer Herbert told Newbury not to wear a chest protector during boxing training, and became angry when she defied him.  ECF No. 1 at 3.  Newbury believes that Deputy Bull also became angry and, as part of the boxing exercise, "aggressively started punching [her]."  ECF No. 49-5 at 25. Superintendent DalPorto testified that he had never known an instance in which an instructor told a female trainee they should not wear a chest protector.  ECF No. 49-2 at 13. Detective Faso subsequently informed the entire class that Officer Herbert had been wrong to tell Newbury not to wear a chest protector.  ECF No. 1 at 3.

SA-008

After the recruits finished their boxing training, Newbury went to get her own water because, although recruits were instructed to bring each other water, nobody would get water for her.  Newbury testified that while she was "huffing" and "puffing" as a result of the exercise, Deputy Ganz was circling her and "sizing [her] up."  Deputy Ganz then reportedly asked her, "What's wrong, hormones?"  ECF No. 49-5 at 27.

The next day, Deputy Grapes instructed the class to perform wrist throws.  Plaintiff testified that Deputy Grapes told her she was not performing the throws correctly, ordered her to stop and watch others, and caused her fellow recruits to become angry at her.  The Verified Complaint also claims that Newbury was isolated during certain activities, including a fingerprinting exercise, which reportedly affected her ability to learn.  ECF No. 1 at 4.

On or about March 4, 2016, some of the recruits went out socially after being dismissed for the day.  Newbury did not join them but was included on a group text message that stated "good times," referring to those in attendance, together with a meme stating "f*** you" to those who did not attend.  *Id.*  Newbury does not know if she was the only one who did not go out with the group, and testified that she has no opinion about whether the meme was discriminatory.  ECF No. 49-5 at 45.

At one point during training, co-recruit Czajka sent a group text stating that "some of you look like a bag of ass" while in uniform.  The text included a fist emoji, which Newbury believes was meant to identify her because of a story she had told the group during which she showed her fist.  ECF No. 49-5 at 54.  She further notes that she was given a men's uniform that did not fit her.  *Id.* at 50-51.  Newbury also received a group text with a YouTube video entitled "Whiskey, Weed, and Women."  ECF No. 1 at 4.  The text included a two-dimensional, black silhouette of a woman.  ECF No. 44-34.  Newbury asserts that the woman depicted on the image is naked.

Newbury further claims that she suffered verbal abuse from superiors while at the Academy.  For example, she alleges that Officer Herbert told her "she was the worst human being ever to live."  ECF No. 1 at 5.  The Verified Complaint alleges that Deputy Grapes told her that "she didn't do a f**ing thing to deserve to be there."  *Id.* at 3.  Another person allegedly told her she was a "disgrace for wasting a valuable position" within her department.  *Id.* at 5.  When Newbury's mascara began to run down her face during a run, Officer Pappas told her that she looked "like an idiot" and to not "wear that again, you're not here to impress anybody."  ECF No. 49-5 at 32

Newbury testified about a series of other events involving Officer Pappas.  On one occasion, Pappas allegedly made a

comment about a logo on the bottom of her pants when she was bending over. ECF No. 49-5 at 33-34. On another, he allegedly asked her to place her arms around him while instructing her, yet the exercise did not require her to do so. *Id.* at 34-35. Finally, Newbury claims that Pappas looked at her buttocks while the students were performing "bear crawls." *Id.* at 35-36.

The Verified Complaint also cites specific events involving Deputy Grapes, including the wrist throw incident discussed above. During firearms training, Grapes allegedly brought a knife close to Newbury's face and threatened to cut her finger off. The threat was in the context of Grapes noticing Newbury's finger on the trigger guard instead of the outside of the trigger. ECF No. 1 at 6. In another incident, Grapes grabbed Newbury's arm and tossed her overhead, but did not do the same to any of her male classmates. ECF No. 49-5 at 58-59.

Newbury claims that she was treated differently than her male counterparts in other ways as well. For example, she alleges that her time for completing an obstacle course was improperly increased by several seconds. ECF No. 1 at 6. Defendant submits that she was appropriately penalized for hitting a cone. ECF No. 44-27. Newbury also contends that although the Academy did not allow recruits to work at other jobs, one of the male recruits continued to own a food truck without being disciplined. DalPorto explained in his deposition

that a recruit could own a business while enrolled at the Academy but could not perform work at the business during the training period.  He also testified that, to his knowledge, Academy personnel had not looked into whether the recruit in question was performing work related to his food truck.  ECF No. 49-2 at 16-18.

Newbury complained of discriminatory treatment to Class President Kennedy.  She specifically complained about receiving a text message containing a picture of a flashlight with a vagina.  ECF No. 49-5 at 41.  Newbury had allegedly been told that any complaint should follow the chain of command, and believed that it was Kennedy's responsibility to pass her complaint on to Academy personnel.  *Id.* at 42.  According to the Academy Rules and Regulations, duties of the Class President included serving as the official representative of the class. Superintendent DalPorto testified that the Class President acted as "the liaison between the recruits and the directors."  ECF No. 49-2 at 6.  DalPorto also testified that if a recruit had an issue, he or she would "traditionally" bring it to the attention of the Class President before speaking with a co-director.  *Id.* at 6.  Defendant notes that nothing in the Academy rules prevented a recruit from speaking directly with an administrator, particularly with respect to such issues as sex discrimination or a hostile work environment.

Academy policy was distinct from the employment policies and procedures of the City of Niagara Falls.  The City had a complaint process as part of its discrimination and harassment policy, encouraging employees to report any prohibited conduct to a department head, the City Administrator, the Director of Personnel, the EEO Officer for Complaint and Workplace Diversity, or to the committee assigned to manage claims of discrimination or harassment.  ECF No. 44-4 at 4.  Newbury did not avail herself of the City's procedures.  ECF No. 49-5 at 81-82.

Kennedy testified that he did not consider himself in the Academy chain of command.  ECF No. 44-32 at 4.  He was reportedly assigned the duty of Class President after "he was the last person to walk in."  *Id.* at 2.  Kennedy described his primary duties as possessing keys to let everyone into the Academy building, and giving a speech at the conclusion of the group's training.  *Id.* at 3.

It is undisputed that Kennedy never reported Newbury's complaints to Detective Faso or, to Faso's knowledge, Lieutenant Schultz.  ECF Nos. 44-35 at 22, 49-9 at 7.  Consequently, Detective Faso was not aware of Newbury's complaints, or of behavior she considered to be discriminatory or harassing.  ECF Nos. 44-35 at 23, 49-9 at 7.  Superintendent DalPorto was similarly unaware of any such behavior, as Newbury made no

13

report to him or to any other employee of the City of Niagara
Falls.  ECF Nos. 44-35 at 23, 49-9 at 7.  It was DalPorto who
ultimately terminated Newbury's employment with the NFPD.

Defendant submits that in her deposition, Newbury testified
that the only thing she ever heard Superintendent DalPorto say
about women or gender, and that she considered discriminatory,
was that "he wasn't going to let someone stupid like me get one
of his boys hurt on the streets."  ECF No. 49-5 at 76.  Newbury
never heard Detective Faso say anything about gender or women
that was discriminatory.  ECF Nos. 44-35 at 25, 49-9 at 8.
Defendant further notes that between 2013 and 2018, while
DalPorto served as NFPD Superintendent, seven women successfully
completed the Academy and became full-time NFPD officers.  ECF
No. 44-2 at 2.  At the conclusion of his tenure as
Superintendent, the NFPD force had 18 women out of a total of
147 officers.  *Id.*

## Discussion

### I.  Summary Judgment Standard

Summary judgment may be granted only when "the movant shows
that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed. R.
Civ. P. 56(a).  "To present a genuine issue of material fact
sufficient to defeat a motion for summary judgment, the record
must contain contradictory evidence such that a reasonable jury

14

could return a verdict for the nonmoving party." *Horror Inc. v. Miller*, 15 F.4th 232, 241 (2d Cir. 2021) (citation omitted). Material facts are facts that "might affect the outcome of the suit under the governing law." *Choi v. Tower Rsch. Cap. LLC*, 2 F.4th 10, 16 (2d. Cir. 2021) (citation omitted).  In considering a motion for summary judgment, a court "construe[s] the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Kee v. City of New York*, 12 F.4th 150, 159 (2d Cir. 2021) (citation omitted).

## II.  Discrimination

Newbury claims that the City discriminated against her based on her gender in violation of Title VII of the Civil Rights Act of 1965 ("Title VII") and the New York State Human Rights Law ("NYSHRL").  Both claims apply the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), under which a plaintiff must first make out a *prima facie* case of discrimination.  *Walsh v. New York City Hous. Auth*., 828 F.3d 70, 74 (2d Cir. 2016). To establish a *prima facie* case, a plaintiff must show that "(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination."  *Id.* at 75

15

(internal quotation marks omitted).  The plaintiff's burden at
this stage is "*de minimis*."  *Weinstock v. Columbia Univ.*, 224
F.3d 33, 42 (2d Cir. 2000).  Nonetheless, she must establish all
four elements of the *prima facie* case before the Court may
proceed.  *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S.
308, 311–12 (1996).

If a plaintiff makes the required initial showing, the
burden of production shifts to the defendant to demonstrate a
legitimate, non-discriminatory reason for the adverse employment
action.  "The defendant must clearly set forth, through the
introduction of admissible evidence, reasons for its actions
which, if believed by the trier of fact, would support a finding
that unlawful discrimination was not the cause of the employment
action."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507
(1993) (internal quotation marks and emphasis omitted).

If the defendant offers a legitimate, nondiscriminatory
explanation for its action, the plaintiff bears the final burden
of demonstrating that defendant's reason was in fact a pretext
for unlawful discrimination.  *See McDonnell Douglas*, 411 U.S. at
804; *Weinstock*, 224 F.3d at 42.  The ultimate question is
whether a discriminatory purpose "was 'a motivating factor' for
an adverse employment decision."  *Gross v. FBL Fin. Servs.,
Inc.*, 557 U.S. 167, 174 (2009) (quoting 42 U.S.C. § 2000e-2(m));
*see also Lenzi v. Systemax, Inc.*, 944 F.3d 97, 108 (2d Cir.

16

2019) ("An employee need only show that sex 'was a motivating factor for any employment practice, even though other factors also motivated the practice.'") (quoting 42 U.S.C. § 2000e-2(m)).

The Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where ... the merits turn on a dispute as to the employer's intent.  At the same time, ... the salutary purposes of summary judgment-avoiding protracted and harassing trials-apply no less to discrimination cases than to other areas of litigation."  *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) (quotation marks, citations, and alterations omitted). Ultimately, "[t]rial courts should not treat discrimination differently from other ultimate questions of fact."  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000).

### A.   Plaintiff's *Prima Facie* Case

Defendant argues that Newbury has failed to meet her *prima facie* burden because there is no evidence that the sole decisionmaker, Superintendent DalPorto, demonstrated any discriminatory animus toward women.  Defendant also contends that Newbury failed to show that similarly situated males were not terminated.  Newbury submits that DalPorto's comments at the final meeting give rise to an inference of discrimination.

At this stage in the analysis, the Court is mindful of Newbury's minimal burden.  It is undisputed that she performed well enough at the Academy to graduate.  The record also indicates that Newbury outperformed at least one male recruit on both written examinations and physical tests.  She was nonetheless terminated immediately prior to graduation, with DalPorto informing her that he was not going to let someone as "stupid" as her "get one of his boys hurt on the streets."

There is no dispute that Newbury is a member of a protected class.  Given that she was due to graduate from the Academy, it is arguable that she was qualified.  She was also the subject of an adverse employment action in the form of job termination. With respect to any inference of discrimination, her allegations that DalPorto fired her to protect "his boys" on the streets, while at the same time allegedly calling her "stupid" and a "piece of shit," satisfy the minimal burden of showing *prima facie* discrimination.

### B.   The City's Legitimate, Non-Discriminatory Reason

Because Newbury has set forth a *prima facie* claim of discrimination, the burden shifts to the Defendant to come forward with a legitimate, nondiscriminatory reason for its decision.  The Supreme Court has explained that "this burden is one of production, not persuasion; it 'can involve no credibility assessment.'"  *Reeves v. Sanderson Plumbing Prods.*

*Inc.*, 530 U.S. 133, 142 (2000) (quoting *Hicks*, 509 U.S. at 509).
The Second Circuit has also made clear that a defendant's burden
of production at this stage is "minimal." *Mhany Mgmt. Inc. v.
County of Nassau*, 819 F.3d 581, 613 (2d Cir. 2016).

The record makes plain that Newbury's performance at the
Academy, although technically sufficient to pass, was often
deemed unacceptable by her trainers.  Some of the most serious
failures occurred during real-world exercises.  For example, in
a traffic stop exercise the trainer noted Newbury's inability to
respond to the threat of a weapon.  Another simulation involved
a citizen drawing a weapon, at which point Newbury reportedly
flinched and turned her back.  In a third simulation, involving
an emotionally disturbed person reaching for a weapon, Newbury
fired several rounds and shot her own partner.  During firearms
training, her peers felt unsafe around her.  Ultimately,
Detective Faso issued his opinion that Newbury would be a
"liability to herself, other Law Enforcement and the public if
placed on duty."

Detective Faso relayed his concerns to Superintendent
DalPorto.  DalPorto's affidavit submits that Faso had been
keeping him informed of the progress of NFPD recruits, and that
he "also received and reviewed a substantial number of memoranda
and reports written by the co-directors and instructors
describing their serious concerns about Ms. Newbury's

performance at the Academy." ECF No. 44-1 at 3. Those reports and memoranda included feedback from Detective Faso, Lieutenant Schultz, Deputy Oliveri, and Deputy Grapes. *Id.* at 4-5. Such feedback, as acknowledged in writing by Newbury, reflected consistent failures in mastery of skills and techniques, and in her ability to accept instruction and make corrections.

DalPorto's affidavit explains that while achieving minimum passing grades is a requirement for graduation, "each recruit must also demonstrate the ability to apply what they have learned to stressful, real-life situations safely and effectively." *Id.* at 3-4. DalPorto also notes that the co-directors and instructors at the Academy did not raise similar concerns about any other NFPD recruits attending the Academy at that time. Finally, DalPorto states that when he made the decision to terminate Newbury's employment, he was not aware of behavior that Newbury considered either harassing or discriminatory "whether from recruits, instructors, or anybody else affiliated with the Academy or NFPD." *Id*. at 5.

While the written documentation of Newbury's shortcomings alone would have provided DalPorto cause for concern, he also had the benefit of advice from the Academy's co-director, Detective Faso. Faso's input on Newbury's readiness for police duties was unequivocal, as he opined that she would be a danger to herself, other officers, and the general public. Given

20

Faso's advice, together with the undisputed documentation of
Newbury's performance, the Court finds the Defendant has
satisfied its burden of showing a legitimate, non-discriminatory
reason for her termination.

    **C.    Pretext**

    Once a defendant offers a legitimate, nondiscriminatory
reason for the adverse employment action, "the employee must be
afforded an opportunity to prove the existence of factual issues
demonstrating that the stated reasons were merely a pretext for
discrimination." *Siani v. State Univ. of N.Y.*, 7 F. Supp. 3d
304, 324 (E.D.N.Y. 2014) (quoting *Meiri v. Dacon*, 759 F.2d 989,
997 (2d Cir. 1985)).  The burden of establishing pretext is a
higher burden than that required to establish the *prima facie*
case, as a plaintiff's "initially vague allegation of
discrimination" must be "increasingly sharpened and focused" at
this stage.  *Meiri*, 759 F.2d at 995.  As noted above, the
ultimate question is whether a discriminatory purpose "was 'a
motivating factor' for an adverse employment decision." *Gross
v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 174 (2009) (quoting 42
U.S.C. § 2000e-2(m)); *see also Lenzi v. Systemax, Inc.*, 944 F.3d
97, 108 (2d Cir. 2019) ("An employee need only show that sex
'was a motivating factor for any employment practice, even
though other factors also motivated the practice.'") (quoting 42
U.S.C. § 2000e-2(m)).

The Court finds that Newbury has failed to carry her burden of showing her termination was pretextual.  DalPorto was presented with clear and consistent documentation of Newbury's poor performance.  Her failures during real-world simulations included shooting her training partner.  Having received Detective Faso's final memorandum expressing deep concerns, DalPorto decided that in order to protect his officers, Newbury could not serve as an employee of the NFPD.

An inference of discriminatory intent may be derived from a variety of circumstances including: "'the employer's criticism of the plaintiff's performance in [sex-based] degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.'"  *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)).  In this case, nothing in DalPorto's decision-making would cause a reasonable juror to infer that gender was a motivating factor.  It is undisputed that several women graduated from the Academy and became full-time members of the NFPD while DalPorto was Superintendent.  It is therefore reasonable to infer that DalPorto's decision was not motivated by a desire to prevent a woman from joining the department.  Moreover, it would be unreasonable to infer that

22

DalPorto's reference to "his boys" did not encompass all members
of the NFPD.  As to DalPorto allegedly calling Newbury a "piece
of shit," the Court's disapproval of such treatment of an
employee does not impact its ultimate conclusion that, even when
making all reasonable inferences in Newbury's favor, the comment
pertained to qualifications rather than gender.

With respect to Newbury's treatment as compared to that of
male recruits, there is nothing in the factual record to suggest
that others performed as poorly as Newbury in certain critical
respects.  While Newbury may have outperformed her peers in
fitness tests and/or on written examinations, Detective Faso
highlighted two significant shortcomings: Newbury's inability to
retain and apply her training proficiently, and her inability to
protect herself and others.  Without any evidence of comparable
shortcomings by recruits, Newbury cannot show that she was
treated differently than members of a non-protected class who
were similarly situated.

Newbury also highlights inappropriate behavior by both
trainers and peers that, she claims, gave rise to an inference
of discrimination.  To the extent that Newbury relies on
performance evaluations by the various trainers, she offers no
evidence that those evaluations were either unfair or
discriminatory.  Trainer comments encouraging her to quit and
insulting her worth as a person might provide greater support

23

for a discrimination claim if they had influenced the termination decision, yet there is no evidence that DalPorto or the City of Niagara Falls were aware of, allowed, or condoned such comments.  The same is true of allegedly discriminatory actions by fellow recruits, as DalPorto testified that he was never notified of Newbury's allegations.  Nor is there any suggestion that DalPorto should have known of such behavior.

Where, as here, "an employer's explanation, offered in clear and specific terms, is reasonably attributable to an honest ... evaluation of qualifications, no inference of discrimination can be drawn."  *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 105 (2d Cir. 2001) (cleaned up), *superseded on other grounds by* Fed. R. Civ. P. 37(e).  The Second Circuit has also counseled that "[t]he court's role is to prevent unlawful hiring practices, not to act as a superpersonnel department that second guesses employers' business judgments."  *Id.* at 103; *see also Bentley v. AutoZoners, LLC*, 935 F.3d 76, 89 (2d Cir. 2019).  According to Detective Faso, co-director of the Academy, Newbury would have been a liability if allowed to serve on active duty.  That opinion was supported by Newbury's performance evaluations, and in particular her conduct during reality-based simulations. Defendant thus had a clear, legitimate, non-discriminatory reason for terminating Newbury's employment, and based upon the

evidence presented at summary judgment, no reasonable juror could conclude that her termination was motivated, even in part, by a discriminatory pretext.

## III. Retaliation

Newbury also claims that she was terminated in retaliation for complaining about her treatment at the Academy. The burden-shifting framework laid out in *McDonnell Douglas* governs retaliation claims under both Title VII and the NYSHRL. *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013). To establish a *prima facie* case of retaliation, Newbury must show: "(1) she engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (citation omitted). "Once a *prima facie* case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action." *Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001). If the employer demonstrates a legitimate, non-discriminatory reason, then "[t]he burden shifts ... back to the plaintiff to establish, through either direct or circumstantial evidence, that the

employer's action was, in fact, motivated by discriminatory retaliation."  *Id.*

Newbury's claim is based upon her report to Class President Kennedy.  That report, however, never reached Superintendent DalPorto or any other employee of the City of Niagara Falls. While there is a dispute of fact as to Kennedy's place in the chain of command, resolving that dispute in Newbury's favor does not help her establish a claim.  Kennedy testified that he did not consider himself in the chain of command and did not communicate Newbury's complaint to superiors.

Newbury claims that because of the chain of command at the Academy, Kennedy was acting as an agent of the Academy, and that the City of Niagara Falls therefore had constructive knowledge of her complaints.  In the Second Circuit, a plaintiff need not show that the ultimate decision-maker knew about her protected activity, and may instead rely on the employer's "general corporate knowledge."  *See Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000); *see also, e.g., Summa*, 708 F.3d at 125 (finding general corporate knowledge where "a number of Hofstra officials ... were aware of Summa's complaints ... [a]nd, at a minimum, the University's legal office knew about the instant litigation").  Here, however, the only person to whom Newbury made a formal complaint was a fellow recruit. While a reasonable juror might consider Kennedy an agent of the

26

Academy and attribute to it a general corporate knowledge, no such juror would deem Kennedy an agent of the City.  Moreover, the City had an anti-discrimination policy with avenues for claims and complaints, and Newbury did not avail herself of those procedures.  The Court therefore finds that Newbury has failed to establish a *prima facie* showing of her employer's awareness of protected activity.

Furthermore, Newbury cannot show that retaliation was a factor in her termination.  The City has presented a legitimate, non-retaliatory reason for Newbury's termination, and the undisputed facts fall far short of showing that, instead, her firing was the result of DalPorto's knowledge of protected activity.  The Court therefore finds that the City is entitled to summary judgment on Newbury's retaliation claim.

## IV.  Hostile Work Environment

To survive summary judgment on a hostile work environment claim, a plaintiff must proffer evidence that the "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  "This standard has both objective and subjective components: the conduct complained of must be severe or

27

pervasive enough that a reasonable person would find it hostile
or abusive, and the victim must subjectively perceive the work
environment to be abusive." *Id.*

"Core hostile work environment cases involve misconduct
that is both frequent and severe, for example, when a supervisor
utters blatant racial epithets on a regular if not constant
basis and behaves in a physically threatening manner." *Aulicino
v. N.Y.C. Dep't of Homeless Servs*., 580 F.3d 73, 82 (2d Cir.
2009) ((internal quotation marks and citations omitted).  In
addition, although "[i]solated incidents usually will not
suffice to establish a hostile work environment, ... [the Second
Circuit has] often noted that even a single episode of
harassment can establish a hostile work environment if the
incident is sufficiently severe." *Redd v. N.Y. Div. of Parole*,
678 F.3d 166, 175–76 (2d Cir. 2012) (internal quotation marks
and citations omitted).  During the period of time at issue in
this case, hostile environment claims brought under the NYSHRL
applied the same standard as those pursued under Title VII.  *See
Farmer v. Shake Shack Enterprises, LLC*, 473 F. Supp. 3d 309, 329
(S.D.N.Y. 2020).

Newbury cites a number of incidents that were clearly
related to her gender.  The most obvious included the remark
about hormones, the flashlight incident, a classmate calling her
"bitch," and the response to her wearing mascara.  She also

28

claims that an instructor looked at her inappropriately.
Newbury further alleges differential treatment, as with the
recruit who was not punished for working outside of the Academy
during training, and the allegedly inaccurate reporting of her
time on the obstacle course. Both of those latter charges are
disputed, as there is no suggestion that Newbury herself tried
to work outside the Academy, or that the penalty imposed for
hitting a cone in the obstacle course was misapplied.

The relationship of other alleged incidents to gender are
unclear. Newbury does not dispute the facts underlying her
performance evaluations. While some conduct by supervisors may
have been harsh, as with the threat to cut off Newbury's finger
when she placed it on the trigger of her weapon, the connection
to gender in those instances is, on the current record,
speculative. It is similarly unclear whether insults and
comments about whether Newbury should be at the Academy were a
part of the training environment or, as alleged, evidence of
workplace hostility on the basis of gender.

The Second Circuit has "cautioned against setting the bar
too high" for hostile work environment claims. *Terry v.
Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003). Defendant argues
that much of Newbury's treatment was related to performance
rather than gender. Defendant further contends that the gender-
related comments, such as a co-recruit calling her "bitch" and

telling her to run faster, were not sufficiently severe to give
rise to liability.  Viewing Newbury's claims in the totality,
however, and assessing her allegations in a light most favorable
to her as the non-moving party, the allegations of mistreatment
during her time at the Academy are sufficient to survive summary
judgment.  *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 387 (2d
Cir. 2020) (courts assess objective hostility according to the
"totality of the circumstances, including: the frequency of the
discriminatory conduct; its severity; whether it is physically
threatening or humiliating, or a mere offensive utterance; and
whether it unreasonably interferes with the victim's [job]
performance").  While the events alleged present a close
question about the true nature of Newbury's treatment, a
reasonable jury could find that such treatment was sufficiently
consistent and demeaning as to unreasonably interfere with her
ability to perform.

Nonetheless, even assuming a hostile environment, Newbury
must also show that the City of Niagara Falls is liable for her
alleged treatment.  For an employer to be held liable under a
hostile environment theory, a plaintiff must establish a
"specific basis for imputing the conduct creating the hostile
work environment to the employer."  *Duch v. Jakubek*, 588 F.3d
757, 762 (2d Cir. 2009) (internal quotation marks omitted).  In
this portion of the analysis, it matters whether the harasser is

30

a supervisor "empowered to take tangible employment actions
against the victim," in which the case the employer will be
strictly liable, or merely a co-worker, which requires a showing
of employer negligence.  *Vance v. Ball State Univ.*, 570 U.S.
421, 424 (2013).  Tangible employment actions include "hiring,
firing, failing to promote, reassignment with significantly
different responsibilities, or a decision causing a significant
change in benefits."  *Id.* at 431.  The negligence standard also
applies to non-employees.  *See Summa*, 708 F.3d at 124.

Newbury does not allege that City employees were aware of
her allegations of either discrimination or a hostile work
environment, as the only specifically-alleged complaint was made
to a co-recruit, Class President Kennedy.  As noted previously,
Kennedy did not communicate that complaint to Academy personnel
and, significantly, the complaint never reached Superintendent
DalPorto, the NFPD, or an employee of the City.

Newbury again contends that she was compelled to report to
Kennedy, that she believed that her complaint would work its way
up the chain of command, and that the City therefore bears
liability for her treatment.  This contention is undermined by a
series of undisputed facts.  First, Newbury was a City employee,
and the City had its own reporting policies and procedures.
Newbury did not avail herself of those procedures.  *See Murray
v. New York Univ. College of Dentistry*, 57 F.3d 243, 249 (2d

31

SA-031

Cir. 1995) (employer may be held liable for co-worker or non-supervisory harassment if it "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it").  Second, while recruits were encouraged to report issues to their Class President, nothing in the Academy rules barred Newbury from speaking directly with the co-directors, other administrators, or someone at the City.  Third, Newbury testified that she spoke with Detective Faso about issues at the Academy, yet nothing in the record suggests that she raised with him allegations of severe or pervasive conduct based upon her gender.  *See, e.g.*, ECF No. 44-29 at 26.

Furthermore, Newbury's claims pertain primarily to individuals who were either her Academy classmates, or to trainers and personnel who had no power over her employment. Statements by Superintendent DalPorto during a single meeting, each of which arguably related to performance rather than gender, are insufficient to support a claim of a hostile work environment.  Consequently, Newbury must show that the City's failure to respond to her work environment was negligent.  *See Vance*, 570 U.S. at 424; *Murray*, 57 F.3d at 249.  Given that no City employee, including Superintendent DalPorto, was notified of Newbury's claims, no reasonable jury could find the City either knew or should have known about her allegations, and was negligent for failing to take appropriate action in response.

32

*See Duch*, 588 F.3d at 762.  The City is therefore entitled to summary judgment on Newbury's hostile work environment claim.[1]

## Conclusion

For the reasons set forth above, the City of Niagara Falls' motion for summary judgment (ECF No. 44) is granted.


DATED at Burlington, Vermont, this 13th day of November, 2023.

<div align="right">

/s/ William K. Sessions III
William K. Sessions III
U.S. District Court Judge

</div>

---

[1]  Defendant's final argument is that Newbury failed to file a notice of claim as required by state law.  Because the Court finds in the City's favor on all substantive claims, it need not resolve this issue.

The New York State Human Rights Law:

§ 296. Unlawful discriminatory practices.

1.   It shall be an unlawful discriminatory practice:

(a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, citizenship or immigration status, sexual orientation, gender identity or expression, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, or status as a victim of domestic violence, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

. . .

(e) For any employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article.

. . . . .

§ 296-D. Unlawful discriminatory practices relating to non-employees.

> It shall be an unlawful discriminatory practice for an employer to permit unlawful discrimination against non-employees in its workplace. An employer may be held liable to a non-employee who is a contractor, subcontractor, vendor, consultant or other person providing services pursuant to a contract in the workplace or who is an employee of such contractor, subcontractor, vendor, consultant or other person providing services pursuant to a contract in the workplace, with respect to an unlawful discriminatory practice, when the employer, its agents or supervisors knew *or should have known* that such non-employee was

subjected to an unlawful discriminatory practice in the employer's workplace, and the employer failed to *take immediate and appropriate corrective action*.  In reviewing such cases involving non-employees, the extent of the employer's control and any other legal responsibility which the employer may have with respect to the conduct of the person who engaged in the unlawful discriminatory practice shall be considered.

Title VII of the Civil Rights Act of 1964:

42 U.S.C. § 2000e-2:

(a) Employer practices

It shall be an unlawful employment practice for an employer –

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

. . . .

42 U.S.C. § 2000e–3:

(a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

. . . .

SA-036