# 23-7976-cv

## United States Court of Appeals

### *for the*

## Second Circuit

ASHLEY NEWBURY,

*Plaintiff-Appellant,*

– v. –

CITY OF NIAGARA FALLS,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLEE

PETER H. WILTENBURG
BOND, SCHOENECK & KING PLLC
200 Delaware Avenue, Suite 900
Buffalo, New York 14202
(716) 416-7000

*Attorneys for Defendant-Appellee*

CP COUNSEL PRESS    (800) 4-APPEAL • (513729)

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................iv

COUNTER-STATEMENT OF THE CASE ............................................1

    Background of Plaintiff's Employment.............................................1

    The City's Discrimination and Harassment Policy .........................1

    The Niagara County Law Enforcement Academy .........................2

    The Academy "Class President".....................................................3

    Plaintiff's Documented Performance Problems .............................4

    Plaintiff's Meeting with Superintendent DalPorto and
    Detective Faso ...............................................................................12

    Plaintiff's Termination ..................................................................12

    The City was Not Aware of Any Alleged Complaints....................13

    NFPD's History of Hiring and Retaining Female Police Officers...............13

    Plaintiff's Allegations Relevant to this Appeal .............................13

SUMMARY OF THE ARGUMENT ...................................................16

    Hostile Work Environment..............................................................17

    Discrimination ................................................................................18

    Retaliation ......................................................................................19

ARGUMENT .....................................................................................19

    I.      STANDARD OF REVIEW ...............................................19

    II.    THE DISTRICT COURT PROPERLY DETERMINED
          THAT THE CITY IS ENTITLED TO SUMMARY
          JUDGMENT ON PLAINTIFF'S HOSTILE WORK
          ENVIRONMENT CLAIM................................................20

          A.    Legal Standard .........................................................20

          B.    No Supervisor Engaged in Conduct Sufficient to
              Support a Claim of Hostile Work Environment .......................22

i

|  | i. | The single DalPorto incident is well short of the standard for a hostile-work-environment claim | 23 |

|  | ii. | NCSO Deputy Grapes was not Plaintiff's "supervisor" | 26 |

| C. | There is No Basis to Impute to the City Allegedly Harassing Conduct by Non-Supervisory Employees and Non-Employees | | 28 |

| D. | Plaintiff's Hostile-Work-Environment Claims Under NYHRL Must be Dismissed for Lack of Actual Knowledge | | 33 |

**III.** THE DISTRICT JUDGE PROPERLY DETERMINED THAT THE CITY IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S DISCRIMINATION CLAIM ........ 33

| A. | Legal Standard | | 33 |

| B. | The City Presented a Legitimate, Non-Discriminatory Reason For Terminating Plaintiff | | 35 |

| C. | The City's Decision to Terminate Plaintiff's Employment Was Not Motivated, Even in Part, By Discriminatory Bias | | 36 |

|  | i. | Standard for the third step of *McDonnell Douglas* | 36 |

|  | ii. | The district judge's determination | 37 |

|  | iii. | On appeal, Plaintiff fails to raise a question of fact about whether the City's decision was motivated in part by discrimination | 38 |

|  |  | a. | Plaintiff fails to identify any similarly-situated comparators | 39 |

|  |  | b. | Plaintiff's "cat's paw" theory fails to create an issue of fact | 43 |

|  |  | c. | Allegedly discriminatory conduct toward Plaintiff does not create an issue of fact as to the City's reason for terminating her employment | 47 |

IV.    THE DISTRICT COURT PROPERLY DETERMINED THAT THE CITY IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S RETALIATION CLAIM .............48

    A.    Plaintiff Failed to Make Out A Prima Facie Case Because the City Had Neither Actual Nor "Corporate" Knowledge of Plaintiff's Alleged Protected Activity...............49

    B.    At the Third Step of *McDonnell Douglas* Plaintiff Fails to Raise a Question of Fact as to Whether Retaliatory Motive Was the "But For" Cause of Her Termination .............50

CONCLUSION .......................................................................................51

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Alfano v. Costello*,
   294 F.3d 365 (2d Cir. 2002)................................................................23

*Aulicino v. N.Y.C. Dep't of Homeless Servs.*,
   580 F.3d 73 (2d Cir. 2009).................................................................21

*Banks v. Gen. Motors, LLC*,
   81 F.4th 242 (2d Cir. 2023)................................................................23

*Bart v. Golub Corp.*,
   96 F.4th 566 (2d Cir. 2024).................................................. 34, 36, 37

*Boyar v. Yellen*,
   No. 21-507, 2022 WL 120356 (2d Cir. Jan. 13, 2022)................... 39, 40

*Brown v. City of Syracuse*,
   673 F.3d 141 (2d Cir. 2012)...............................................................34

*Brown v. Coach Stores, Inc.*,
   163 F.3d 706 (2d Cir. 1998)........................................................ 24-25

*Burlington Indus., Inc. v. Ellerth*,
   524 U.S. 742 (1998) ..........................................................................27

*Delaney v. Bank of Am. Corp.*,
   766 F.3d 163 (2d Cir. 2014)..................................................... 19, 20, 35

*Dowrich-Weeks v. Cooper Square Realty, Inc.*,
   535 F. App'x 9 (2d Cir. 2013).............................................................27

*Duch v. Jakubek*,
   588 F.3d 757 (2d Cir. 2009)....................................................... 21, 22

*Edwards v. Rochester Inst. of Tech.*,
   794 F. App'x 65 (2d Cir. 2019)...........................................................46

*Erasmus v. Deutsche Bank Americas Holding Corp.*,
   No. 15 CIV. 1398 (PAE), 2015 WL 7736554
   (S.D.N.Y. Nov. 30, 2015) ...................................................................33

*Farmer v. Shake Shack Enterprises, LLC*,
   473 F. Supp. 3d 309 (S.D.N.Y. 2020)................................................21

*Forrest v. Jewish Guild for the Blind, et al.*,
3 N.Y.3d 295 (2004) ............................................................................33

*Gordon v. New York City Bd. of Educ.*,
232 F.3d 111 (2d Cir. 2000).................................................... 29, 49

*Graham v. Long Island R.R.*,
230 F.3d 34 (2d Cir. 2000)..................................................................39

*Gross v. FBL Fin. Servs., Inc.*,
557 U.S. 167 (2009) ............................................................................37

*Hamilton v. DeGennaro*,
2019 WL 6307200 (S.D.N.Y. Nov. 25, 2019) ....................................39

*Harris v. Forklift Sys., Inc.*,
510 U.S. 17 (1993) ..............................................................................20

*Heiden v. New York City Health & Hosps. Corp.*,
No. 20-CV-10288 (LJL), 2023 WL 171888 (S.D.N.Y. Jan. 11, 2023)...............40

*Howley v. Town of Stratford*,
217 F.3d 141 (2d Cir. 2000)........................................... 23, 24, 25, 26

*In re Nortel Networks Corp. Sec. Litig.*,
539 F.3d 129 (2d Cir. 2008)................................................................45

*Johnson v. Schmid*,
750 F. App'x 12 (2d Cir. 2018).............................................................40

*Johnstone v. Vill. of Monticello*,
691 F. App'x 657 (2d Cir. 2017)...........................................................24

*Jones v. Target Corp.*,
792 F. App'x 54 (2d Cir. 2019).............................................................46

*Langlois v. Hartford Bd. of Educ.*,
831 F. App'x 548 (2d Cir. 2020)...........................................................24

*Lenzi v. Systemax, Inc.*,
944 F.3d 97 (2d Cir. 2019)..................................................................37

*Mario v. P & C Food Mkts.*,
313 F.3d 758 (2d Cir. 2002)................................................................34

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973) .................................................................. *passim*

*Petronio v. Nat'l R.R. Passenger Corp.*,
    836 F. App'x 39 (2d Cir. 2020).................................................................44

*Raspardo v. Carlone*,
    770 F.3d 97 (2d Cir. 2014)......................................................... 20, 40

*St. Mary's Honor Ctr. v. Hicks*,
    509 U.S. 502 (1993) ...........................................................................35

*State Div. of Human Rights ex rel. Greene v. St. Elizabeth's Hosp.*,
    66 N.Y.2d 684 (1985) .........................................................................33

*Staub v. Proctor Hosp.*,
    562 U.S. 411 (2011).............................................................................47

*Summa v. Hofstra Univ.*,
    708 F.3d 115 (2d Cir. 2013).................................................................22

*Swiderski v. Urb. Outfitters, Inc.*,
    No. 14-CV-6307 (JPO), 2017 WL 6502221 (S.D.N.Y. Dec. 18, 2017) ..............33

*Tex. Dep't of Cmty. Affairs v. Burdine*,
    450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981) ....................................35

*Tolbert v. Smith*,
    790 F.3d 427 (2d Cir. 2015)......................................................... 26, 27, 34

*Univ. of Texas Sw. Med. Ctr. v. Nassar*,
    570 U.S. 338, 133 S. Ct. 2517, 186 L. Ed. 2d 503 (2013) ...................................48

*Vance v. Ball State Univ.*,
    570 U.S. 421 (2013) ..................................................................... 21, 27

*Vasquez v. Empress Ambulance Serv., Inc.*,
    835 F.3d 267 (2d Cir. 2016)................................................................44

*Wall v. Charter Commc'ns, Inc.*,
    2022 WL 4095840 (W.D.N.Y. Sept. 7, 2022).......................................35

*Ya-Chen Chen v. City Univ. of N.Y.*,
    805 F.3d 59 (2d Cir. 2015)......................................................... 34-35

*Zann Kwan v. Andalex Grp. LLC*,
    737 F.3d 834 (2d Cir. 2013)................................................................48

## Statutes and Other Authorities:

42 U.S.C. § 2000e-2(m) ...........................................................................37

## COUNTER-STATEMENT OF THE CASE

### Background of Plaintiff's Employment

Defendant-Appellee City of Niagara Falls (the "City") hired Plaintiff-Appellant Ashley Newbury ("Plaintiff") as an officer for the Niagara Falls Police Department ("NFPD") on or about February 1, 2016, subject to a one-year probationary period. (A37). E. Bryan DalPorto was Superintendent of NFPD from 2013-2018. *Id*. As Superintendent, he made all decisions on hiring and firing police officers during and after their probationary period. *Id*.

### The City's Discrimination and Harassment Policy

The City's Discrimination and Harassment Policy (the "Policy") is distributed to all City employees at the beginning of their employment (A51-59). It expressly prohibits discrimination, workplace harassment, including sexual harassment, and retaliation. (A51). The Policy's Complaint Process Overview encourages employees to report any prohibited conduct to either a department head, the City Administrator, the Director of Personnel, the EEO Officer for Compliance and Workplace Diversity, or to the Discrimination/Harassment Committee. (A54-55). The Policy further encourages employees to seek guidance from the EEO Officer or the Discrimination/Harassment committee as to how to file a complaint. (A54). The Policy provides a reporting form, and sets forth the

procedure it follows when an individual files a complaint. (A56-59). Plaintiff

acknowledged receiving the Policy on January 26, 2016. (A60).

### The Niagara County Law Enforcement Academy

The City requires all newly-hired police officers to successfully complete

training at the Niagara County Law Enforcement Academy ("NCLEA" or

"Academy"). (A38). NCLEA is a multi-jurisdictional police academy open to all

law enforcement agencies in New York State, and typically draws recruits and

instructors from several agencies in Western New York. *Id*. It is co-sponsored by

the City and by the Niagara County Sheriff's Office ("NCSO"). *Id*.

The spring 2016 Academy, the "62nd NCLEA," was co-directed by then-

NFPD Detective John Faso and NCSO Lieutenant Aaron Schultz. (A37-38). This

Academy class had 14 recruits,[1] four of whom, including Plaintiff, were employed

by the City. (A38). Plaintiff was the only female in the class. (A184, A370).

The Academy training is compulsory, and essential for the safety and

welfare of the general public and officers. (A38). The curriculum includes

defensive tactics, physical training, emergency vehicle operation, firearms, and

first responder training. *Id*.  It involves both classroom instruction and practical,

reality-based scenarios and applications. *Id*. To successfully complete the

---

[1] The City's statement of material facts incorrectly stated that the class had 13 recruits. (A184).

Academy and become a NFPD officer, a recruit must demonstrate proficiency in both the classroom material and in application of that knowledge and skill in simulated "real life" situations. *Id*. While achieving passing grades in the Academy's course curriculum is necessary to graduate from the Academy and become a full-time police officer, it is not sufficient: each recruit must also demonstrate the ability to apply what they have learned to the real-life situations safely and effectively. (A39-40).

The Academy follows a "paramilitary" structure and often resembles a military-style boot camp, where training is intense, demanding, and anxiety-provoking. (A38-39). This teaching approach has a degree if artificial stress built into it, which is intended to help recruits gain confidence that they can handle the real-life emergencies they will inevitably face on duty. (A39). It is administered to all recruits at the Academy, male and female. *Id*.

### *The Academy "Class President"*

The "Niagara County Law Enforcement Academy Rules and Regulations" state that the recruit class shall elect a "President" and a "Treasurer" for the purpose of "conducting class business matters." (A65). The document further states that "[s]tudents will elect a class President and Treasurer to serve as their representative for the duration of their training." *Id*. The class President's "duties" are stated as: "preside over class meetings. He/She may appoint various recruit

3

class committees as needed. He/She shall be the official representative of the class." *Id*.

The document also states in another section that "the chain of command of this academy is Co-Director(s), Training Instructor, Guest Instructors, Class President, and Recruit/student." (A62).

The President of the 62nd NCLEA was Keith Kennedy, an NCSO employee. (A150). Mr. Kennedy became class president because "he was the last person to walk in and they told [him he] was going to be the class president." (A150). The other recruits were given the opportunity to choose another person to be president, but elected not to. (A151). To Mr. Kennedy, being class president meant only that he "got yelled at first," and his responsibilities consisted of having keys to the Academy and getting there early to let everyone in, and giving a speech at the end of the Academy. (A150-51). Mr. Kennedy did not consider himself to be in the "chain of command," and when the instructors or directors had an issue with a student or they had to send directives, they talked to the recruit class as a whole. (A153).

***Plaintiff's Documented Performance Problems***

Almost immediately from the start, and continuing throughout her time at the Academy, Plaintiff's instructors drafted reports and memoranda stating their grave concerns about her performance and capabilities.

On February 3, 2016, NCSO Investigator J. Andres issued a Report of Recruit Development stating that Plaintiff was unable to perform break falls from any of the positions taught, and that she "also appeared to be ignoring the advice and instruction of the instructors, failing to complete the technique even with one on one instruction." The report further noted that due to Plaintiff's consistently poor form and effort the entire class was disciplined on her account. (A75).

On February 9, 2016, Investigator Andres issued a Report of Recruit Development stating that Plaintiff was unable to perform the wrist twist or wrist throw, and that Plaintiff "did not appear to be paying attention to instruction." (A76).

On February 10, 2016, Detective Faso wrote a memo to Superintendent DalPorto, stating that Inspector Gebhardt informed the co-directors about his concerns about Plaintiff, specifically that she had been crying throughout his instruction on appearance tickets. The memo further stated that Plaintiff told the co-directors that she had been "feeling overwhelmed with everything going on over the last two weeks." They reassured her that this was common with new recruits, and that she would soon get into the routine and things should get better. (A77).

On February 17, 2016, Investigator Andres issued a Report of Recruit Development stating that Plaintiff was "below expectations and standards in

almost every respect" in boxing that day. Plaintiff "did not execute any punches in the manner in which she was taught prior, and was unable to protect herself even from the weakest of punches. Ms. Newbury appeared as if she would give up or run away from any actual fight in a real life situation." (A78).

On February 24, 2016, Detective Faso and Lieutenant Schultz issued a memo to Plaintiff informing her that her test average for the Article 35/Use of Force portion of the academy, after three tests, was 79%, and that the required minimum was 85%. The memo further stated that she would be given remedial training and then the opportunity to take up to two more tests to bring her average up to the minimum requirement. (A79).

On February 25, 2016, Investigator Andres issued a Report of Recruit Development stating that Plaintiff was unable to perform the "front choke escape" properly even with one-on-one instruction that took the instructor away from the rest of the class. It further stated that Plaintiff's "lack of focus and poor effort once again led to the entire class being disciplined, which once again wasted precious class time." (A80).

On March 3, 2016, Detective Faso wrote a memo to Superintendent DalPorto stating that he and Lieutenant Schultz had informed Plaintiff that she was not meeting the minimum standards in Defensive Tactics. The memo further stated that Detective Faso observed that Plaintiff had "proven time and again that she

cannot perform most tasks independently without support from her instructors." The memo further noted that Plaintiff would be provided with remedial training, though the Academy was not required to do so because Plaintiff did not request it. (A81).

On March 16, 2016, Investigator Andres issued a Report of Recruit Development stating that Plaintiff was unable to perform the "defense from a tackle" at any point during the lesson, despite one-on-one instruction that again took the instructor away from the rest of the class. The report further noted that this has "become a distraction to the class," and that "Ms. Newbury does not appear to be developing or improving in any discernable or measurable way." (A82).

On March 25, 2016, Detective Faso wrote a memo to Superintendent DalPorto concerning "Aerosol Subject Restraint" training. The memo stated that Plaintiff had cried repeatedly throughout the instruction portion of the training, despite reassurances from Lt. Schultz that though it was not pleasant, it is done in a safe, controlled environment. The memo continued that during the practical portion of the training Plaintiff broke down and began crying again. She continued with the training, and once exposed to oleoresin capsicum, she "showed little ability to defend herself properly," and "failed to secure her firearm… creating an extreme safety hazard." The memo noted that after decontamination, Plaintiff broke down crying again and was unable to participate further. (A83).

On March 29, 2016, North Tonawanda Police Officer Herbert issued a letter to NCSO Deputy Grapes about Plaintiff's lack of progress in Defensive Tactics. Officer Herbert noted that he had attended every Defensive Tactics training, and had worked with Plaintiff almost every day. He wrote that despite his efforts to work one-on-one with Plaintiff to try to help her progress, she had continued "to perform the tactics wrong and with a lack of intensity or sense of urgency"; "freezes up when she faces adversity and fails to make a decision to improvise"; and "loses her bearing very easily by frequently crying or failing to act." (A84).

On March 29, 2016, NCSO Deputy Grapes wrote an Administrative Report to the NCLEA directors, stating that Plaintiff "has failed to respond to training in many aspects throughout the Defensive Tactics instruction," and that "when the recruits are told to perform tactics that they were recently taught, Recruit Newbury acts as if she has never seen the technique before." The report concluded that Plaintiff "fails to follow instructions, to make an effort to apply the techniques properly after she has been taught the technique and to practice the techniques which is expected of all recruits. Her failure to perform the techniques and tactics that has been taught to her shows her inability to protect herself in a highly stressed environment." (A85-86).

On March 31, 2016, co-directors Faso and Schultz informed Plaintiff in a memorandum that she was not meeting the minimum standards in Defensive Tactics Training, and that she would be given remedial training. (A87).

Plaintiff's midterm report stated that Plaintiff was "struggling" in Defensive Tactics and that she was "failing to grasp basic concepts." The report further noted that Plaintiff was "unsure of herself and [was] prone to breaking down and crying during difficult times of instruction both in the classroom and during proficiency areas." (A88).

On or about April 9, 2016, NFPD Officer Andrew Pappas gave Plaintiff six hours of remedial training in Defensive Tactics. He noted that Plaintiff lacked intensity and decision-making skills. (A89).

On April 13, 2016, Detective Faso wrote a memo to Superintendent DalPorto stating that Mr. Kennedy informed him, privately, that the class was afraid to attend the upcoming firearms training with Plaintiff, because, "due to her lack of sound tactics and safety during Defensive Tactics training, they believe she will be unsafe during firearms training." Detective Faso further wrote that he and the lead firearms instructors decided to assign a firearms training instructor to shadow Plaintiff during firearms training to ensure she demonstrated sound safety precautions. (A90).

In an undated memorandum, Deputy Lisa C. Oliveri wrote that Plaintiff failed the Professional Traffic Stop portion of the academy, and "is able to perform the minimum requirements of a traffic stop but when the stop escalates she is unable to control, restrain, search and contain the situation." Deputy Oliveri further wrote that Plaintiff "continually places herself in a position of disadvantage, compromising her safety and the safety of other officers. She is unable to recognize a threat and react appropriately." She further wrote that Plaintiff was unable to effectuate an arrest properly, and that "she is able to perform each step while being instructed but unable to do so independently." She further wrote that Plaintiff was unable to recognize and respond appropriately to the threat of a weapon, and that Plaintiff's inability to perceive a threat or "recognize it to be a life threatening situation… is a severe deficiency in this recruit." (A91).

Deputy Oliveri is female. (A41).

On May 17, 2016, Detective Faso wrote a memo to Superintendent DalPorto concerning Plaintiff's performance in Reality Based Training (RBT) (A93-94). He expressed his "grave concerns about recruit Newbury's ability to properly and more importantly, safely perform under stressful life threatening situations." (A93). Detective Faso further noted that though Plaintiff achieved a score of 91% on the Defensive Tactics exam, "less than two weeks later when put in real life situations during RBT, she was unable to demonstrate basic tactics." *Id*. Detective

Faso specifically noted that during RBT Plaintiff "placed her handgun in vulnerable positions," including by placing it on the ground instead of holstering it, something that she had also failed to do properly in previous trainings. *Id*. Most concerning to Detective Faso was that Plaintiff "chose to open fire on a role player as her partner was attempting to subdue him. *Id*. The result was that she shot her partner but missed the role player." *Id*. Detective Faso summed up his assessment of Plaintiff as follows:

> It is my opinion as a twenty-one year veteran of Law Enforcement and Co-Director or the NCLEA, that although with continued remediation, recruit Newbury was able to meet Academy standards, she is unable to retain the information and demonstrate continued proficiency in these areas for any length of time. I further believe that at this point recruit Newbury would be a liability to herself, other Law Enforcement and the public if placed on duty.

(A94).

On May 18, 2016, Lieutenant Schultz wrote a memo to Superintendent DalPorto following reality-based training, which noted the "catastrophic consequences from Recruit Newbury's response to a man with a gun," and that "the decisions Recruit Newbury made were catastrophic to the ideals and fundamentals of police work." (A96). Specifically, during the simulated real-life encounters, Plaintiff turned her back to a man who drew a gun on her, and in another scenario she fired her gun at her partner while he struggled to subdue an individual, striking her partner. *Id*.

The co-directors and instructors of the 62nd NCLEA did not raise concerns similar to those expressed about Plaintiff about the performance of any of the other three recruits employed by the City — Patrick Ciccarelli, Michael Maio, and Rashaad Travis. (A41).

### *Plaintiff's Meeting with Superintendent DalPorto and Detective Faso*

On May 20, 2016, Superintendent DalPorto and Detective Faso met with Plaintiff in Superintendent DalPorto's office. Detective Faso's memo states that Superintendent DalPorto advised Plaintiff about Detective Faso's conclusion about her fitness to perform police work safely. Detective Faso noted that Plaintiff responded by taking little to no responsibility for her performance, and instead attempted to blame her classmates. The memo further stated that Superintendent DalPorto told Plaintiff that a decision would soon be made concerning her future with NFPD, and that her employment may be terminated. (A97).

### *Plaintiff's Termination*

Superintendent DalPorto made the decision to terminate Plaintiff's employment with NFPD on or about May 26, 2016, because he determined that Plaintiff would pose a risk to herself and others if she became a police officer. (A40). His decision was informed by the totality of information he had concerning Plaintiff's performance, including the reports and memos from instructors and the co-directors, and conversations with the co-directors. (A40-41; A140; A142).

### The City was Not Aware of Any Alleged Complaints

Neither Detective Faso nor Superintendent DalPorto had any knowledge of alleged discriminatory or harassing conduct toward Plaintiff at the Academy, or that Plaintiff ever reported any such alleged conduct to anybody, including Mr. Kennedy. (A41-42; A44). Plaintiff never reported any alleged discrimination or harassment to any City employee. (A135-36).

### NFPD's History of Hiring and Retaining Female Police Officers

From 2013-2018, during Superintendent DalPorto's tenure, seven females successfully completed the Academy and became full-time NFPD officers. (A44). At the conclusion of Superintendent DalPorto's tenure at the end of 2018, there were 18 female NFPD officers out of a total of 147 NFPD officers. *Id*. Females therefore represented 12.2% of the total police force, which was roughly the national average. *Id*. As of April 2023, there were 22 female NFPD officers, representing 15% of the police force. *Id*.

### Plaintiff's Allegations Relevant to this Appeal

Plaintiff alleges that during an "Indian run," co-recruit Sebastian Czajka "screamed at [Plaintiff] from behind, telling to go faster and to hurry up." (A10). Plaintiff later testified at her deposition that Mr. Czajka yelled at her, "speed it up bitch, let's go." (A105). After this incident, Plaintiff said to Mr. Kennedy, "is he

13

[Mr. Czajka] kidding, like are you kidding me, we were running because of him, and I was going as fast as I could." (A107).

Plaintiff alleges that NCSO Deputy Bull "called Plaintiff aside and asked her why she was present and that she needed to quit." (A10). Plaintiff further alleges that on the same day, North Tonawanda Police Department (NTPD) Officer Herbert told Plaintiff not to put her chest protector on. *Id.*

Plaintiff alleges that NCSO Deputy Grapes told Plaintiff that "she didn't do a f**ing thing to deserve to be there." (A10).

Plaintiff alleges that on another occasion, NCSO Deputy Grapes instructed the class to line up and perform wrist throws on Plaintiff and told Plaintiff that she was not performing the throws correctly, which led to punishment. (A10; A113). That same day, NCSO Lieutenant Schultz "asked Plaintiff to 'look deep down' at herself and 'quit.'" (A10).

At some point during the Academy, Mr. Czajka sent a group text to the entire class with a picture of his boot next to a brush and boot polish, and another picture of an ironing board with his uniform shirt, an iron, and a spray can of starch. (A171). The pictures were followed by a message saying, "As a whole we are pretty squared away, but some of you look like a bag of ass. Just saying!" followed by a fist emoji. (A174). Mr. Czajka immediately sent another text message to the group, stating, "Got to be proud of what you are doing and that goes into your

14

appearance… We are a good bunch and I really want us to shine! We have what it takes to be the best class to have walked that campus. Never settle, always improve. Nobody is perfect but we should constantly be striving for it. Stand tall and kick some ass [emoji]". *Id.*

Plaintiff believes that Mr. Czajka's "bag of ass" remark was directed to her because it was followed by a fist emoji, even though Mr. Czajka wrote, "those of you." (A121). She believes that this text message was discriminatory because she was given a men's uniform, which would look big on her no matter how hard she tried to take care of it. (A122).

At some point during the Academy, a co-recruit sent a group text message to the entire class with a picture of a flashlight with a vagina on it after the class was told to purchase a flashlight for night shooting. (A11; A154).

Plaintiff alleges that NTPD Officer Herbert told Plaintiff that "she was the worst human being ever to live." (A10; A123-24).

Plaintiff alleges that she was told that she was a "disgrace for wasting a valuable position" within her department. (A11). Plaintiff believes that NCSO Deputy Bull is the one who made this remark. (A125).

Plaintiff alleges that at some point during firearms training, NCSO Deputy Grapes brought a knife close to Plaintiff's face and threatened to cut her finger off,

because he saw that Plaintiff's finger was on the trigger guard when it should have been on the outside of the trigger. (A35).

Plaintiff alleges that Deputy Grapes attempted to hurt her twice when he "grabbed Plaintiff's arm and tossed her overhead." (A12).

Plaintiff alleges that on May 9, 2016, she completed an E.V.O.C. obstacle course in 1:26, but Lieutenant Ware recorded her time as 1:36. (A13). Plaintiff acknowledges that she hit one cone during the obstacle course. (A129). Plaintiff's "E.V.O.C. Score Sheet" from her "Cumulative Road Course" from May 9-13, 2016 indicates that on her sixth run, Plaintiff's "raw time" was 1:26, and that she was assessed one skill penalty and she hit one cone, each of which added five seconds to her "total time." The Score Sheet indicated that Plaintiff's "total time" for the sixth run was therefore 1:36. (A100).

Plaintiff alleges that during her meeting Superintendent DalPorto and Detective Faso on May 20, 2016, DalPorto called her a "piece of shit" (A353-354) and that he "wasn't going to let someone stupid like [her] get one of his boys hurt on the streets." (A355).

## SUMMARY OF THE ARGUMENT

This is an employment discrimination and retaliation case under Title VII and the New York State Human Rights Law (NYSHRL). The district judge's grant

of summary judgment in the City's favor should be affirmed in its entirety. Plaintiff fails to raise any material questions of fact for trial.

### Hostile Work Environment

This claim is based on an alleged series of comments, group text messages, and training situations that occurred while Plaintiff was enrolled at a police academy during the first (and only) four months of her employment. The academy included recruits and instructors from NFPD and other law enforcement agencies. All of the allegedly harassing conduct, save for one exception, was committed by Plaintiff's classmates or instructors who were neither her supervisors nor City employees. Plaintiff did not report the conduct through the City's established procedure or even mention it informally to any City employee. She alleges only that she mentioned it to co-recruit Keith Kennedy, an employee of the Niagara County Sheriff's Office (NCSO), because Mr. Kennedy had been designated the "class President." Plaintiff argues that because the academy's "Rules and Regulations" state that the "class President" is between the recruits and instructors in the "chain of command," the City should, in the exercise of reasonable care, have known about Plaintiff's comments to Mr. Kennedy.

Even if Plaintiff's allegations are true, the alleged conduct by non-supervisory and non-employees cannot be imputed to the City. It is undisputed that the City maintained a reasonable avenue for reporting and had no actual

knowledge of the alleged conduct. Plaintiff has failed to raise an issue of fact as to whether the City, in the exercise of reasonable care, should have known about it. No rational juror could find that Mr. Kennedy's position as "class President" was such that the City was negligent in not being aware of Plaintiff's alleged comments to him. Plaintiff's sole allegation of harassing conduct by a supervisor comes from a single interaction, which falls well short of this Circuit's standard for such claims.

### *Discrimination*

On step three of the *McDonnell Douglas* analysis, Plaintiff fails to raise a question of fact as to whether the City's decision was motivated, even in part, by discriminatory bias. The district judge correctly determined that Superintendent DalPorto's alleged remarks to Plaintiff on a single occasion, in light of their context, are insufficient to raise a question about his motivations for the termination decision. Plaintiff's various arguments on appeal must fail. She identifies no similarly-situated males; no other recruits had performance issues resembling Plaintiff's. Her "cats's paw" argument fails because she cannot show that the City was negligent in relying on any allegedly tainted memos from instructors. The allegedly inappropriate conduct directed toward Plaintiff by non-decisionmakers is irrelevant because there is no evidence that the sole

decisionmaker knew of it or condoned it, or that any of the information in performance memos was actually false.

### Retaliation

Plaintiff has failed to make out her prima facie case because she has not shown that the City was aware of her allegedly protected activity. The City had no actual knowledge. Mr. Kennedy's position as "class President" did not make him an "agent" of the City; the City therefore had no "corporate knowledge" of her allegedly protected activity.

Even if Plaintiff has established a prima facie case, she has failed to raise a question of fact as to whether retaliatory motive was the "but for" cause of her termination, when it is undisputed that the decisionmaker had no knowledge of any allegedly protected activity, there is no other evidence of retaliatory motive, and the City had a strong and clearly-stated legitimate, non-retaliatory reason for Plaintiff's termination.

## ARGUMENT

### I.   STANDARD OF REVIEW

This court "review[s] *de novo* a district court's grant of summary judgment." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014) (citation omitted). In so doing, the court "construe[s] the facts in the light most favorable to the non-moving party and ... resolve[s] all ambiguities and draw[s] all reasonable

inferences against the movant." *Id*. (citation omitted). "A dispute about a 'genuine issue' exists ... where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Id*. (citation omitted). The court will "uphold a grant of summary judgment if the evidence, viewed in the light most favorable to the party against whom it was entered, demonstrates that there are no genuine issues of material fact and that the judgment is warranted as a matter of law." (citation and internal quotation marks omitted).

## II. THE DISTRICT COURT PROPERLY DETERMINED THAT THE CITY IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S HOSTILE WORK ENVIRONMENT CLAIM

### A. *Legal Standard*

To survive summary judgment on a hostile work environment claim, a plaintiff must proffer evidence that the "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014) (quoting *Harris v. Forklift Sys., Inc*. 510 U.S. 17, 21 (1993)). "This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Id*.

"Core hostile work environment cases involve misconduct that is both frequent and severe, for example, when a supervisor utters blatant racial epithets on a regular if not constant basis and behaves in a physically threatening manner." *Aulicino v. N.Y.C. Dep't of Homeless Servs*., 580 F.3d 73, 82 (2d Cir. 2009) (internal quotation marks and citations omitted). Hostile work environment claims under Title VII and the NYSHRL are judged by the same standard. *Farmer v. Shake Shack Enterprises, LLC*, 473 F. Supp. 3d 309, 334 (S.D.N.Y. 2020).[2]

For an employer to be held liable under a hostile work environment theory, a plaintiff must establish a "specific basis for imputing the conduct creating the hostile work environment to the employer." *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009) (internal quotation marks omitted). If the harasser is a supervisor, who is somebody "empowered to take tangible employment actions against the victim," the employer is strictly liable. *Vance v. Ball State Univ*., 570 U.S. 421, 424 (2013). If the harasser is a non-supervisory co-worker or non-employee, "the employer will be held liable only for its own negligence, and the plaintiff must demonstrate that the employer failed to provide a reasonable avenue for complaint or that it knew, or in the exercise of reasonable care should have known, about the

---

[2] In August 2019, the NYSHRL was amended to eliminate the "severe or pervasive" standard for such claims, but where, as here, the events in the case preceded that amendment, the prior standard applies. *Farmer*, 473 F. Supp. 3d at 334, fn. 9.

harassment yet failed to take remedial action." *Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013) (citing *Duch*, 588 F.3d at 762)).

The district judge found that though the record presents a "close question," a reasonable jury could find that Plaintiff's alleged treatment at the academy met the standard for a hostile work environment claim. (A438). The district judge further found, however, that Plaintiff failed to show that this conduct can be imputed to the City. (A440-41). Specifically, the district judge determined that the alleged statements by Superintendent DalPorto during a single meeting are insufficient to support a claim of hostile work environment. *Id*. He further determined that no reasonable jury could find that the City either knew or should have known about Plaintiff's other allegations. *Id*. For the reasons set forth below, this Court should affirm.

### B. *No Supervisor Engaged in Conduct Sufficient to Support a Claim of Hostile Work Environment*

Plaintiff argues that there were two instances where the conduct of a "supervisor" created a hostile work environment: her single meeting with Superintendent DalPorto and Detective Faso, and the firearms training when NCSO Deputy Grapes threatened to cut off Plaintiff's finger when she improperly placed it near the trigger of a loaded gun. Neither incident, even if true, aids Plaintiff in defeating summary judgment on her hostile-work-environment claim.

*i. The single DalPorto incident is well short of the standard for a hostile-work-environment claim*

Plaintiff alleges that during their lone meeting Superintendent DalPorto called her a "piece of shit" and told her that "he wasn't going to let someone stupid like [her] get one of his boys hurt on the streets." She argues that this single incident was itself enough to create a question of fact on a hostile-hostile-work-environment claim, for which the City would be strictly liable because Superintendent DalPorto was her supervisor.

Plaintiff faces a very high bar in her attempt to even create an issue of fact about whether a single incident can serve as the basis for a hostile-work-environment claim. "A single incident must be extraordinarily severe to support a hostile work environment claim, but it need not involve an actual or threatened physical assault." *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 263 (2d Cir. 2023) (citations and internal quotation marks omitted). "[A] single act can meet the threshold if, by itself, it can and does work a *transformation of the plaintiff's workplace*." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (citing *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000) (emphasis added)).

This allegation does not clear that high bar. DalPorto's alleged remarks were neither "extraordinarily severe" nor could they "work a transformation" of the workplace. They allegedly took place during a brief meeting, attended only by Superintendent DalPorto, Plaintiff, and Detective Faso, during which

23

Superintendent DalPorto advised Plaintiff of Detective Faso's recommendation. (A97). Plaintiff does not allege that Superintendent DalPorto was physically threatening or intimidating. Nor does she allege that her relationship with any other instructors or recruits was affected by the remarks at this meeting. Detective Faso noted that Plaintiff responded to the message about her performance by blaming her classmates and taking no responsibility. *Id*. Contrary to Plaintiff's unsupported assertion, this meeting happened before Superintendent DalPorto decided to terminate Plaintiff. (*Cf.* A97; A40). The district judge noted his disapproval of these alleged remarks — disapproval that the City would certainly share, if the remarks had indeed actually happened — but correctly determined that they are not enough to support Plaintiff's claim.

This court has repeatedly affirmed dismissal of hostile work environment claims based on a single incident that was far more severe. *See*, *e.g.*, *Johnstone v. Vill. of Monticello*, 691 F. App'x 657 (2d Cir. 2017) (affirming dismissal where allegedly drunken town mayor berated town police officer, who was arresting the mayor outside work, as a "racist," a "cracker," a "white mother f**ker," a "member of the KKK," and a "Nazi"); *Langlois v. Hartford Bd. of Educ*., 831 F. App'x 548, 552 (2d Cir. 2020) (affirming summary judgment for employer where the plaintiff alleged "occasional rude interactions with bosses" and "few isolated comments by the school principal"); *Brown v. Coach Stores, Inc*., 163 F.3d 706,

713 (2d Cir. 1998) ("Although the alleged comments are despicable and offensive, they fail to constitute discriminatory behavior that is sufficiently severe or pervasive to cause a hostile work environment.").

By the same token, there is a clear distinction between the severity of the conduct alleged here and cases where this court *has* found a question of fact on a hostile-work-environment claim based on a single encounter. An instructive comparison is *Howley v. Town of Stratford*, F.3d 141, 154 (2d Cir. 2000), where this court reversed summary judgment on a hostile-work-environment claim by a female firefighter. In that case the harasser unleashed a barrage of obscene verbal abuse toward the plaintiff in front of a number of her subordinates, which included: "shut the f*ck up, you whining c*nt"; "there's no way I will f*cking apologize to that whining c*nt down there"; and insinuation that plaintiff obtained her rank by performing oral sex. *Id*. at 149. In explaining its reasoning for reversing summary judgment for the employer and making the rare exception to find an issue of fact on hostile work environment from just a single incident, the court wrote:

> considering all the circumstances, Holdsworth's conduct could reasonably be viewed as having intolerably altered Howley's work environment, for Holdsworth did not simply make a few offensive comments; nor did he air his views in private; nor were his comments merely obscene without an apparent connection to Howley's ability to perform her job. Although Holdsworth made his obscene comments only on one occasion, the evidence is that he did so at length, loudly, and in a large group in which Howley was the only female and many of the men were

her subordinates. And his verbal assault included charges that Howley had gained her office of lieutenant only by performing fellatio. It cannot be concluded as a matter of law that no rational juror could view such a tirade as humiliating and resulting in an intolerable alteration of Howley's working conditions.

*Id*. at 154.

The circumstances here are drastically different. Superintendent DalPorto's words were not sexually explicit or vulgar, they were made only in front of another supervisor, they did not in any way undermine Plaintiff's standing with co-workers, and they were not loud or threatening. If anything, they were "a few offensive comments," only one of which made reference to gender. *See*, *e.g.*, *Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015) (affirming summary judgment on hostile-work-environment claim where plaintiff alleged principal made two offensive statements; one concerned race, the other was ambiguous). No rational juror could conclude that these alleged remarks intolerably altered Plaintiff's working conditions.

### ii. NCSO Deputy Grapes was not Plaintiff's "supervisor"

"[A]n employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered that employee to take tangible employment actions against the victim, *i.e.*, to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in

benefits.' " *Vance v. Ball State Univ.*, 570 U.S. 421, 431 (2013) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). "[T]he question of supervisor status, when contested, can very often be resolved as a matter of law before trial." *Id.* at 443.

Deputy Grapes was employed by NCSO, not the City. There is no evidence to suggest that the City could have empowered Deputy Grapes to take tangible employment actions against Plaintiff, let alone that the City actually did. He therefore had no ability to "to inflict direct economic injury" on Plaintiff. *Id.* at 440. Plaintiff has failed to raise a question of fact as to whether Deputy Grapes was her supervisor; the City cannot be strictly liable for his alleged harassment, even if true.

Moreover, the alleged incident with Deputy Grapes cannot form the basis of Plaintiff's hostile-work-environment claim because it does not have any connection to sex or gender. *See, e.g.*, *Dowrich-Weeks v. Cooper Square Realty, Inc.*, 535 F. App'x 9, 13 (2d Cir. 2013) (affirming dismissal of hostile-work-environment claim in part because plaintiff "ha[d] not presented sufficient factual allegations to suggest that the harassment she faced was rooted in her sex or any other protected characteristic) (citation and internal quotation marks omitted); *Tolbert*, 790 F.3d at 439. Plaintiff alleges that Deputy Grapes became enraged during firearms training when he observed that Plaintiff was holding her finger

near the trigger in such a way that could result in accidental discharge and catastrophic injury. She does not allege he said anything about her sex or gender. There is no evidence that any male recruit made a similar mistake and received a lighter reprimand. Deputy Grapes' conduct may have been overly harsh and inappropriate. But it cannot create a question of fact about a gender or sex-based hostile-work-environment when there is no evidence that it had anything to do with gender or sex.

### C. *There is No Basis to Impute to the City Allegedly Harassing Conduct by Non-Supervisory Employees and Non-Employees*

Plaintiff alleges that a long series of comments, interactions, group text messages, and police academy situations created a hostile work environment. By Plaintiff's account, some of it was done by fellow recruits, and some of it was done by academy instructors; but *none* of it was done by her supervisors. It is undisputed that the City provided Plaintiff with a reasonable avenue for reporting alleged discrimination or harassment, but that Plaintiff never informed any City employee about this alleged conduct, not even informally. Under these circumstances, where the City had no actual knowledge, the standard is whether the City was negligent in not knowing about her alleged reports. With the exercise of reasonable care, should it have known?

Plaintiff's only argument is that the City should have known about this alleged harassment because she "reported" some of it to Mr. Kennedy, the "class president," who was, according to a single, out of context line in the academy's "Rules and Regulations," situated between Plaintiff and her supervisors in the "chain of command." Plaintiff is grasping at straws. No rational juror could find that the "class president" position or the "chain of command" line in the Rules and Regulations were significant enough to create a duty for the City to be informed about everything that another recruit may have mentioned to the class president. The City was not negligent in failing to learn what Plaintiff may have said to Mr. Kennedy. Plaintiff's arguments on this point must be rejected for several reasons.

First, Plaintiff argues that Kennedy's role as "class president" and position in the "chain of command" gave the City "general corporate knowledge" of Plaintiff's reports to him, even if Kennedy was not technically an "agent" of the City. (App. Br. at 18-21). In doing so, she cites *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000), for the proposition that "a plaintiff need not show that the ultimate decision-maker knew about her protected activity, and may instead rely on the employer's 'general corporate knowledge.' " (App. Br. at 17-18).

Plaintiff is attempting to conflate concepts and misapply case law. The "general corporate knowledge" standard applies to the "knowledge" element of a

prima facie retaliation claim, not imputation of hostile-work-environment claims. The relevant inquiry is not whether Mr. Kennedy was an "agent" of the City; it is whether with the exercise of reasonable care the City should have been aware of Plaintiff's alleged complaints to him.

An analysis of the "class president" position and the notion of "chain of command" in the "Rules and Regulations" establishes that no rational juror could conclude that the City was negligent, nor that with reasonable care should it have known about Plaintiff's complaints to Mr. Kennedy.

The purported duties of the "class President" are contained in the Academy "Rules and Regulations" document. In the "Miscellaneous" section it provides that "[s]tudents will elect a class President and Treasurer to serve as their representative for the duration of their training." (A65). The "duties" of the class president are defined as: "preside over class meetings. He/She may appoint various class committees as needed. He/She shall be the official representative of the class." *Id*.

Elsewhere in the document, three pages earlier in a different section called "Academy Rules and Regulations," one of the 19 listed rules states, without further explanation: "The chain of command of this academy is Co-Director(s), Training Instructor, Guest Instructors, Class President, and Recruit/student." (A62). Other rules listed in this section include: that all "unnecessary talking, moving around, etc., shall cease prior to the start of each class"; "food and drink is not permitted in

the classroom, locker room or gymnasium"; and that smoking and horseplay are not permitted. (A63).

Mr. Kennedy was appointed class president because "he was the last person to walk in and they told [him he] was going to be the class president." (A150). The other students were given the opportunity to choose another class president, but they chose not to. (A151). To him, being class president meant essentially that he "got yelled at first," and his responsibilities were to have the keys to the Academy and get there early to let everyone in, and to give a speech at the end of the Academy. (A150-151). He did not consider himself to be in the "chain of command," and when the Academy instructors or directors had an issue with a student or they had to send directives, they talked to the recruit class as a whole. (A153).

All of these undisputed facts show that the role of "class President" was not a meaningful position with any real responsibility. It is clear from the language in the manual that the class president's role, if anything, was to communicate with instructors *on behalf of the class*, on issues having to do with the Academy itself. The only other defined roles of the "class President" involved presiding over meetings and appointing committees. No rational juror could conclude that the class President's role included receiving confidential, sensitive reports of workplace harassment or discrimination from his peers, and be expected to

31

properly handle and report them. No rational juror could conclude that the single reference to the "chain of command *of this academy*" in the "Rules and Regulations" was anything more than a general policy concerning the communication of *Academy* issues affecting the entire class to the instructors or co-directors.

Moreover, Mr. Kennedy was not a City employee. The City did not control who would be the class president. After Mr. Kennedy was told that he would be class president, the other students had the opportunity to pick somebody else; there is no evidence that the City had any control over this process. According to his testimony, Mr. Kennedy did not even want the job. No rational juror could conclude that the City, in the exercise of reasonable care, would have any reason to suspect that a recruit might report a private, sensitive, personnel matter to the class president, or that it *should have known* about any such reports, especially when the City established its own comprehensive procedure for reporting. It is nonsensical for the City to be liable for alleged reporting made to somebody it did not hire and did not control, simply because he was placed in a position through a process that the City did not control, and was supposedly in the City's "chain of command" due to a single line in a set of Rules and Regulations that the City did not draft.

### D. Plaintiff's Hostile-Work-Environment Claims Under NYSHRL Must be Dismissed for Lack of Actual Knowledge

At the very least, this court should affirm summary judgment in favor of the City on Plaintiff's hostile-work-environment claim under NYSHRL. "The NYSHRL… preclude[es] "imputation 'unless the employer became a party to it by encouraging, condoning, or approving it.' " *Swiderski v. Urb. Outfitters, Inc*., No. 14-CV-6307 (JPO), 2017 WL 6502221, at \*7 (S.D.N.Y. Dec. 18, 2017) (citing *Erasmus v. Deutsche Bank Americas Holding Corp*., No. 15 CIV. 1398 (PAE), 2015 WL 7736554, at \*8 n.14 (S.D.N.Y. Nov. 30, 2015) (quoting *Forrest v. Jewish Guild for the Blind et al*., 3 N.Y.3d 295, 311 (2004))). "Condonation ... contemplates a knowing, after-the-fact forgiveness or acceptance of an offense." *Id*. (citing *State Div. of Human Rights ex rel. Greene v. St. Elizabeth's Hosp*., 66 N.Y.2d 684, 687 (1985)). No rational juror could find that the City condoned the alleged harassment when it lacked actual knowledge of it.

## III. THE DISTRICT JUDGE PROPERLY DETERMINED THAT THE CITY IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S DISCRIMINATION CLAIM

### A. *Legal Standard*

In order to survive a motion for summary judgment, a plaintiff alleging a claim of gender discrimination under both Title VII and NYSHRL must satisfy the

three-part burden-shifting test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015).

A plaintiff must first establish a prima facie case by showing that: "(1) [she] belonged to a protected class; (2) [she] was qualified for the position held; (3) [she] suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (citations and internal quotation marks omitted).

If the plaintiff makes this showing, the burden shifts to the defendant to proffer some legitimate, nondiscriminatory reason for the adverse decision or action. *McDonnell Douglas Corp.*, 411 U.S. at 802. If the defendant proffers such a reason, the defendant "will be entitled to summary judgment…unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *Mario v. P & C Food Mkts.*, 313 F.3d 758, 767 (2d Cir. 2002) (citations omitted).

Once the employer has made this showing, the "plaintiff can survive summary judgment by showing that the employer's stated reason for the adverse employment action is entirely pretextual, or that the employer had mixed motives, one of which was the desire to discriminate." *Bart v. Golub Corp.*, 96 F.4th 566, 573 (2d Cir. 2024) (citing *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 76 n.13

(2d Cir. 2015)). At all times, the plaintiff bears the ultimate burden of proof. *See,*

*St. Mary's Honor Ctr. V. Hicks*, 509 U.S. 502, 511 (1993).

### B. *The City Presented a Legitimate, Non-Discriminatory Reason For Terminating Plaintiff*

"The threshold for establishing a legitimate nondiscriminatory reason is not

a high standard." *Wall v. Charter Commc'ns, Inc.*, 2022 WL 4095840, at *10

(W.D.N.Y. Sept. 7, 2022) (citation omitted). "The defendant need not persuade the

court that it was actually motivated by the proffered reason[ ]. It is sufficient if the

defendant's evidence raises a genuine issue of fact as to whether it discriminated

against the plaintiff." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 168 (2d Cir.

2014) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct.

1089, 67 L.Ed.2d 207 (1981)).

The City has produced voluminous evidence of its reason for terminating

Plaintiff's employment: her instructors, and eventually Superintendent DalPorto,

concluded from Plaintiff's performance at the academy that she was not capable of

performing police work safely. Over the course of the entire academy, at least

seven different instructors drafted at least 20 memoranda stating their grave

concerns about Plaintiff's inability to grasp techniques, inability to apply what she

had been taught, poor effort, inability to respond to even low levels of stress, poor

judgment, and the serious safety risks that would result if she were put on duty. *See*

*generally* A186-196 (Defendants' Statement of Undisputed Material Facts ¶¶ 26-52).

After witnessing Plaintiff's performance throughout the Academy, including reality-based training, Detective Faso informed Superintendent DalPorto that he "believes that at this point recruit Newbury would be a liability to herself, other Law Enforcement and the public if placed on duty." (A93-94). Superintendent DalPorto based his termination decision on these assessments. (A40-41). The district judge correctly determined that the City met its burden to establish that it terminated Plaintiff for a legitimate, non-discriminatory reason.

**C. *The City's Decision to Terminate Plaintiff's Employment Was Not Motivated, Even in Part, By Discriminatory Bias***

   i.   *Standard for the third step of* McDonnell Douglas

This court recently reiterated and clarified the standard for evaluating the third step of the *McDonnell Douglas* analysis. *See*, *Bart v. Golub*, 96 F.4th 566 (2d Cir. 2024). It recognized the distinction between cases involving a claim that the employer had a "single motive" to discriminate and those in which the employer had a "mixed motive," meaning that the employer had legitimate, non-discriminatory reasons for its action, but was also motivated in part by discriminatory bias. *Id*. To survive summary judgment, a plaintiff alleging that the employer had a "single motive" must create a question of fact as to whether the

employer's proffered reason was "false, and merely a pretext for discrimination." *Bart*, 94 F.4th at 576. By contrast, where a plaintiff alleges that an employer had a "mixed motive," she "may also satisfy this burden by producing other evidence indicating that the employer's adverse action was motivated at least in part by the plaintiff's membership in a protected class." *Id*.

> ii.    *The district judge's determination*

Though the district judge's decision predated *Bart*, it applied the correct standard. The judge wrote that in the third step analysis, the "ultimate question is whether a discriminatory purpose was a motivating factor for an adverse employment decision," (A429) (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 174 (2009) (internal quotation marks omitted); 42 U.S.C. § 2000e-2 (m)), and that "an employee need only show that sex was a motivating factor for any employment practice, even though other factors also motivated the practice." *Id*. (citing *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 108 (2d. Cir. 2019) (citations and internal quotation marks omitted).

The district judge determined that Plaintiff failed to produce evidence showing that sex was more likely than not a motivating factor in the City's decision to terminate her employment; that "nothing in DalPorto's decision-making would cause a reasonable juror to infer that gender was a motivating factor." (A430). Specifically, the district judge determined that (1) the undisputed fact that

several women graduated from the academy and became full-time members of NFPD during DalPorto's tenure indicates that his decision was not motivated by a desire to prevent a woman from joining the department (A430); (2) a reasonable juror would therefore not infer that DalPorto's alleged reference to "his boys" was a reference to all members of NFPD (A431); (3) the alleged remark that Plaintiff is a "piece of shit" pertained to qualifications, not gender (A431); (4) without any evidence of comparable shortcomings by male recruits, Plaintiff cannot show that she was treated differently than members of a non-protected class who were similarly situated (A431); and (5) there is no evidence that Superintendent DalPorto or the City were aware of, allowed, or condoned any allegedly discriminatory comments by instructors or peers directed toward Plaintiff. (A431-32).

     iii.    *On appeal, Plaintiff fails to raise a question of fact about whether the City's decision was motivated in part by discrimination*

Plaintiff makes essentially three arguments for there being a question of fact as to whether discrimination motivated the City's determination in part: (1) disparate treatment — that male recruits were treated differently from Plaintiff; (2) a "cat's paw" theory— that the memos written by Plaintiff's instructors, then relied upon by Superintendent DalPorto, were tainted by a discriminatory bias; and (3) comments or behavior allegedly directed toward Plaintiff during the academy demonstrate "gender-based animus." (App. Br. At 25-28). None of these

arguments is sufficient to raise a question of fact as to whether sex or gender bias motivated Superintendent DalPorto's decision even in part.

   a. *Plaintiff fails to identify any similarly-situated comparators*

"A showing that similarly situated employees [outside the protected group] received more favorable treatment can… serve as evidence that the employer's proffered legitimate, non-discriminatory reason for the adverse job action was a pretext for ... discrimination." *Graham v. Long Island R.R.*, 230 F.3d 34, 43 (2d Cir. 2000). An employee is similarly situated to other employees if they were (1) "subject to the same performance evaluation and discipline standards" and (2) "engaged in comparable conduct." *Id.* at 40. The employee must be similarly situated "in all material respects," *id.* at 39, and the comparison requires "a reasonably close resemblance of facts and circumstances," *id.* at 40. "A proposed comparator is not similarly situated unless she engaged in all of the same misconduct as plaintiff, or at least committed the most serious infractions for which the plaintiff was subjected to an adverse employment action." *Hamilton v. DeGennaro*, 2019 WL 6307200, at *11 (S.D.N.Y. Nov. 25, 2019).

This court has recently recognized that a suitable comparator to a plaintiff terminated for poor performance would be another employee with similarly poor performance. In *Boyar v. Yellen*, the plaintiff was terminated for poor performance and a dress code violation. No. 21-507, 2022 WL 120356, at *2 (2d Cir. Jan. 13,

2022). Plaintiff argued that three co-workers who did not share his protected characteristics were treated more favorably than he was. *Id*. This court affirmed dismissal of plaintiff's disparate treatment claim because the plaintiff failed to allege that the comparators "engaged in similar disapproved behaviors at work or *had similarly poor performance*." *Id*. (emphasis added) (citing *Raspardo v. Carlone*, 770 F.3d 97, 126 (2d Cir. 2014) ("In the context of employee discipline, ... the plaintiff and the similarly situated employee must have engaged in comparable conduct, that is, conduct of comparable seriousness." (internal quotation marks omitted)); *see also*, *Johnson v. Schmid*, 750 F. App'x 12, 17 (2d Cir. 2018) (affirming summary judgment, in part because alleged comparators were not similarly situated); *Heiden v. New York City Health & Hosps. Corp.*, No. 20-CV-10288 (LJL), 2023 WL 171888, at *26 (S.D.N.Y. Jan. 11, 2023) (granting summary judgment on discrimination claims where the plaintiff failed to "proffer any evidence that similarly situated non-disabled employees were similarly cited for poor performance and received more favorable treatment.").

Here, Plaintiff identifies no male recruit who received a performance assessment that even remotely resembles her own. No male recruit was consistently written up in memos for poor effort, inability to grasp and apply concepts, and for failing to adhere to safety protocol in firearms training. No male recruit performed in reality-based training in a way that was "catastrophic to the

ideals and fundamentals of police work." (A96). No male recruit was deemed to be

a "a liability to [him]self, other Law Enforcement and the public if placed on duty."

(A94). For this reason, the district court correctly determined that Plaintiff failed to

identify a comparator that raises an issue of fact as to whether discrimination was a

motivating factor in her termination.

On appeal, Plaintiff again fails to remedy this shortcoming. She argues that

Michael Maio is a suitable comparator because he was allowed to graduate from

the Academy and become an NFPD officer even though he scored below Plaintiff

on some written examinations, failed a physical fitness test, and "was expressly

warned that his test average was below the cumulative minimum required." (App.

Br. at 26). These alleged performance issues, even if accepted as true, are nothing

like Plaintiff's. No instructors ever raised concerns about Mr. Maio's ability to

apply the instructional material to real-life situations and safely perform police

work. The fact that Mr. Maio graduated from the academy and became an NFPD

officer has no bearing on the City's decision to terminate Plaintiff's employment.

Moreover, Plaintiff misrepresents Mr. Maio's performance. She cites a

notice informing Mr. Maio that his cumulative test average in Article 35/Use of

Force was 82%, below the required level of 85%, and that he would have up to two

more chances to bring his average above the threshold. (A277). Plaintiff omits that

she received a similar notice about her own 79% average (A79), and that Mr. Maio

brought his cumulative average up to 91% on the next test (A262-263). Plaintiff's claim that Mr. Maio "failed the physical fitness test" is apparently based on the report of a single test failed by six of the 14 recruits (A369); Plaintiff omits mention of Maio's midterm report that he passed the "physical training" portion, including by improving his time on the 1.5 mile run (A278), the apparent reason he failed the earlier test. *See* A369. Finally, while Plaintiff argues she outperformed Mr. Maio on written tests, she fails to mention that Mr. Maio received an undisputedly passing final grade of 84 (A279). None of Plaintiff's assertions about Mr. Maio support her argument.

Plaintiff also cites a number of alleged things that happened to her at the academy that did not happen to male recruits. For example, she cites her allegations that: (1) no male recruits received the "harsh" treatment that she did (App. Br. at 25) (citing A437); (2) no male recruit was threatened with a knife by an instructor (*id*. at 27, citing A12); (3) Plaintiff was grabbed by the arm and tossed to the ground by an instructor (*id*., citing A337-38); (4) Plaintiff was given an inaccurately low score on E.V.O.C. (*id*., citing A337-38); and (5) instructors repeatedly urged Plaintiff to quit (*id*., citing A300-301). Because none of this allegedly disparate treatment concerns performance problems similar to Plaintiff's, it does nothing to generate a question of fact about the City's motive in terminating Plaintiff.

Again, Plaintiff misrepresents the alleged incidents she references. For example, record evidence shows that the E.V.O.C. instructor accurately recorded her time of 1:36 after adding 10 seconds for penalties to Plaintiff's "raw time" of 1:26. (A100). Plaintiff admitted hitting the cone. (A129 at 101:20-21).

Further, the City has introduced evidence that the Academy environment was harsh and challenging for *all* recruits. It "resembles a military style boot camp," where "the training is intense, demanding, stressful, and anxiety-provoking" and "has a degree of artificial stress built into it." (A39 ¶ 8). Mr. Kennedy's testimony made clear that harsh treatment and getting yelled at was part of the Academy experience for all recruits. He testified that the instructors "would light us all up… By light us up, I mean they would yell at us, you know, smoke us as they call it." (A405). On one particular day the recruits got "destroyed," meaning "smoked," and that the class would be made to run, and do wall-sits, sit-ups and pushups, and "that day we were just nonstop from the start of the class to the end of the class. We were just smoked the whole time." (A407-08).

        b. *Plaintiff's "cat's paw" theory fails to create an issue of fact*

Though her brief never uses the term, Plaintiff advances a "cat's paw" theory to argue that there is a question of fact as to whether discrimination was a motivating factor in the City's decision, based on the City's reliance on instructor memos that were "tainted" by discrimination. "In a cat's paw case, a plaintiff can

succeed 'even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the decisionmaking process.'" *Petronio v. Nat'l R.R. Passenger Corp.*, 836 F. App'x 39, 42 (2d Cir. 2020) (citing *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 272 (2d Cir. 2016) (internal quotation marks, brackets, citation omitted)). Employers can be liable under the cat's paw theory only when they were negligent: The cat's paw theory "should not be construed as holding an employer liable simply because it acts on information provided by a biased co-worker… [t]hus, an employer who, non-negligently and in good faith, relies on a false and malign report of an employee who acted out of unlawful animus cannot, under this 'cat's paw' theory, be held accountable for or said to have been 'motivated' by the employee's animus." *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 275 (2d Cir. 2016) (citations omitted).

Here, Plaintiff argues that Deputy Grapes' observation that Plaintiff "cannot control her emotions when she is put under even low amounts of stress" in his March 29, 2016 memo (A85) may have been the product of bias. (App. Br. at 25-26). She further speculates that this sentence later became the basis for Detective Faso's observation that Plaintiff "tends to become overly emotional during stress situations." (App. Br. 25) (A93-94). This argument fails for at least two reasons.

First, Plaintiff failed to raise this argument in the district court. "[I]t is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal." *In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 132–33 (2d Cir. 2008) (citations and internal quotation marks omitted). "Although [this court] may exercise discretion to consider waived arguments where necessary to avoid a manifest injustice, the circumstances normally do not militate in favor of an exercise of discretion to address … new arguments on appeal where those arguments were available to the [parties] below and they proffer no reason for their failure to raise the arguments below." *Id*. at 133 (citations and internal quotation marks omitted). Unless Plaintiff proffers a reason for her failure to raise this argument below, this court should deem it waived.

Second, even if Deputy Grapes' memo was tainted by bias, Plaintiff has failed to show that the City was negligent in considering it. Plaintiff makes no argument that Superintendent DalPorto knew or should have known that Deputy Grapes harbored bias. She cites no evidence that would support such an argument, such as past discrimination complaints or conduct reasonably known to the City, or any other facts that could raise a question of fact about whether his memo could have been motivated by bias. Even if, giving Plaintiff every favorable inference on this motion, this court finds a question of fact about Deputy Grapes' bias, there is simply no evidence that the City reasonably could have known about it.

Moreover, Plaintiff's speculation that Deputy Grapes' March 29, 2016 memo influenced Detective Faso's May 17 memo is unfounded. Detective Faso's memos throughout the academy, including those that mentioned Plaintiff's inability to control her emotions in stressful situations, were based on his personal observation. For example, his March 25, 2016 memo following Aerosol Subject Restraint (ASR) training stated his observations that Plaintiff cried repeatedly throughout the instructional portion and broke down crying at two other times. (A83).

Finally, the fact that the City received so many other memos corroborating the concerns expressed by each instructor defeats Plaintiff's cat's paw argument. The City simply could not have been negligent in reaching its termination decision when it received a total of about 20 memos, one of which was written by a female instructor, and the unvarnished opinion of co-director Faso that Plaintiff would be a danger to herself and others. *See*, *e*.g., *Edwards v. Rochester Inst. Of Tech*., 794 F. App'x 65, 67 (2d Cir. 2019) (summary judgment finding no liability under cat's paw theory affirmed where the "evidence shows that [the discriminatory employee] did not have authority over [the plaintiff] when she was terminated," and that "[a]lthough [the employer] consulted with [the discriminatory employee] before terminating [plaintiff], [the employer] also spoke with four other [ ] employees" and found the "evidence was consistent"); *Jones v. Target Corp*., 792 F. App'x 54, 56-57 (2d Cir. 2019) ("While an independent investigation does not necessarily

insulate a defendant from liability, it does where … 'it results in an adverse action for reasons unrelated to the supervisor's original biased action.' ") (quoting *Staub v. Proctor Hosp*., 562 U.S. 411, 420-22 (2011)).

          c. *Allegedly discriminatory conduct toward Plaintiff does not create an issue of fact as to the City's reason for terminating her employment*

Plaintiff cites allegedly discriminatory conduct directed toward her during the academy as evidence that can create a question of fact as to whether Superintendent DalPorto's decision was partly motivated by bias. For example, she references her allegation that an officer said she "looked like an idiot" because she wore mascara, and that another recruit said she looked like a "bag of ass" in her uniform and on another occasion called her a "bitch." (App. Br. At 26). She also references a memo criticizing her for being overly emotional and her midterm report that criticized her for being "prone to breaking down and crying." *Id*.

Plaintiff fails to explain how any of this relates to Superintendent DalPorto's decision. She does not allege that Superintendent DalPorto was aware of or condoned any of the inappropriate comments from a co-recruit. Nor does she allege that the memos describing her as being overly emotional or being prone to breaking down and crying were not factually accurate. These allegations, even if true, do not raise an issue of fact as to whether discriminatory bias was a motivating factor in the City's decision.

## IV. THE DISTRICT COURT PROPERLY DETERMINED THAT THE CITY IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S RETALIATION CLAIM

Both Title VII and NYSHRL retaliation claims are reviewed under the *McDonnell Douglas* burden-shifting analysis. *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). "Under the first step of the *McDonnell Douglas* framework, the plaintiff must establish a prima facie case of retaliation by showing 1) participation in a protected activity; 2) the defendant's knowledge of the protected activity; 3) an adverse employment action; and 4) a causal connection between the protected activity and the adverse employment action." *Id*. (citation and internal quotation marks omitted). The second and third steps are identical to the analysis of discrimination claims. *See*, *e.g.*, *id.*, at 845. A significant difference, however, is that "a plaintiff alleging retaliation in violation of Title VII must show that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision." *Id*. (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360, 133 S. Ct. 2517, 2533, 186 L. Ed. 2d 503 (2013)).

The district judge granted summary judgment in favor of the City on Plaintiff's retaliation claim for two reasons. First, Plaintiff failed to establish the "knowledge" element of her prima facie case because the City had no actual knowledge of any alleged "protected activity" and no reasonable juror could

48

conclude that Mr. Kennedy was the City's "agent." Second, the City provided a legitimate, non-retaliatory reason for Plaintiff's termination, and Plaintiff failed to raise a question of fact as to whether retaliation was a motivating factor. This court should affirm on both points.

### A. Plaintiff Failed to Make Out A Prima Facie Case Because the City Had Neither Actual Nor "Corporate" Knowledge of Plaintiff's Alleged Protected Activity

It is undisputed that Plaintiff never reported alleged discrimination or harassment to the City, through the City's established avenue for reporting or otherwise. (A135-136). Superintendent DalPorto was not aware of any protected activity when he decided to terminate Plaintiff's employment. (A42). This court has recognized that a plaintiff need not show that the ultimate-decisionmaker knew about the protected activity, and may instead rely on the employer's "general corporate knowledge." *See*, *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000). Plaintiff argues that her alleged reports to Mr. Kennedy provided the City with "general corporate knowledge" because as class president, Mr. Kennedy was in the "chain of command."

For the reasons set forth in Section II.C. above, Mr. Kennedy was not an "agent" of the City. He was not employed by the City. While he testified that the co-directors of the academy appointed him class president, he also testified that the recruit class had the opportunity to elect somebody else to be president, which is in

line with the Rules and Regulations' statement that the recruit class elects the president. There is no evidence that any City employee, including Detective Faso, had the authority to direct or change Mr. Kennedy's working conditions; Mr. Kennedy's own supervisor, Lt. Schultz, was also a co-director of the academy, and there is no evidence that Superintendent DalPorto or anybody else at the City made the final determination that Mr. Kennedy would graduate from the academy and join the NCSO. Mr. Kennedy's position as "class President" in the "chain of command" did not entail any actual responsibility to the City that would be sufficient to render him an "agent" for this purpose. Plaintiff has failed to create a question of fact as to whether the City knew about her protected activity.

**B. *At the Third Step of* McDonnell Douglas *Plaintiff Fails to Raise a Question of Fact as to Whether Retaliatory Motive Was the "But For" Cause of Her Termination***

To survive summary judgment, Plaintiff must produce evidence sufficient to create an issue of fact as to whether retaliation was the "but for" cause of her termination. She argues that the district judge failed to consider the temporal proximity between her alleged protected activity and her termination. (App. Br. at 33). This argument conflates the required showing for the "causation" element of her prima facie case — a lower threshold for Plaintiff — with the "but for" causation required on the third step of the *McDonnell Douglas* analysis, where Plaintiff has the burden to actually produce evidence relevant to whether retaliation

was a motivating factor. She also argues that the district judge should have considered alleged disparate treatment of male peers; this must be rejected for the same reasons stated in Section III.C.iii.a. above. In short, no rational juror could conclude that retaliation was the "but for" cause of Plaintiff's termination, when the decisionmaker, Superintendent DalPorto, was unaware of any protected activity when he made the decision, and the City had a thoroughly well-supported legitimate reason for its decision.

## **CONCLUSION**

For the foregoing reasons, the City of Niagara Falls respectfully requests that this court affirm the judgment of the district court in its entirety, thereby granting summary judgment in favor of the City on each of Plaintiff's claims.

Dated:  Buffalo, New York
June 20, 2024

Respectfully submitted,

**BOND, SCHOENECK & KING PLLC**

By: _____/s/ Peter H. Wiltenburg_____
Peter H. Wiltenburg, Esq.
Avant Building – Suite 900
200 Delaware Avenue
Buffalo, New York 14202
(716) 416-7000
pwiltenburg@bsk.com

*Attorneys for Defendant-Appellee*
*City of Niagara Falls*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the page limitation of Fed. R. App. P. 32(a)(7)(A) and the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) and Local Rule 32.1(a) because this brief contains 11,724 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. R. App. P. 32(a)(7)(B)(ii), according to Microsoft Word's Word Count function. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced serif typeface using Microsoft Word in plain Times New Roman 14-point font, using italics for case names or emphasis only.

Dated:  Buffalo, New York
       June 20, 2024

                        **BOND, SCHOENECK & KING PLLC**

                        By: _____ /s/ Peter H. Wiltenburg _____
                            Peter H. Wiltenburg, Esq.
                            Avant Building – Suite 900
                            200 Delaware Avenue
                            Buffalo, New York 14202
                            (716) 416-7000
                            pwiltenburg@bsk.com

                            *Attorneys for Defendant-Appellee*
                            *City of Niagara Falls*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused the foregoing brief to be filed with the Clerk of the Court of the United States Court of Appeals for the Second Circuit via the court's electronic filing system on June 20, 2024 and caused true and accurate copies of the same to be timely served upon Plaintiff-Appellant's counsel via electronic filing.

Dated:  Buffalo, New York
       June 20, 2024

**BOND, SCHOENECK & KING PLLC**

By: _____/s/ Peter H. Wiltenburg_____
     Peter H. Wiltenburg, Esq.
     Avant Building – Suite 900
     200 Delaware Avenue
     Buffalo, New York 14202
     (716) 416-7000
     pwiltenburg@bsk.com

     *Attorneys for Defendant-Appellee*
     *City of Niagara Falls*